### In re YORK FURNITURE COMPANY, INC., d/b/a York Antiques, Ltd., Debtor.

### Bankruptcy No. 82 B 12040.

United States Bankruptcy Court, S.D. New York.

Aug. 8, 1983.

---

8. Wis.Stat. § 59.13(1)(g):

Horvath & Young, New York City, for debtor; Leonard E. Rosenthal, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for petitioning creditors; Harvey A. Strickon, Larry I. Glick, New York City, of counsel.

## DECISION AFTER TRIAL ON CONTESTED INVOLUNTARY PETITION

BURTON R. LIFLAND, Bankruptcy Judge.

On October 19, 1982, Kings Antiques Corp. ("Kings"), the petitioning creditor, accompanied by two others, filed an involun-tary Chapter 7 petition under Title 11 of the United States Bankruptcy Code ("the Code") against York Antiques, Ltd. Upon discovering that York Antiques, Ltd. was a defunct corporation, an amended petition was filed on October 25, 1982 against York Furniture Company, Inc., d/b/a York Antiques, Ltd. ("York" or "the respondent").

Respondent contends that Kings is an ineligible creditor and that the involuntary petition does not satisfy the threshold requirement of Section 303(b) of the Code.[1] Respondent asserts that Kings' claim is based upon a loan made at a usurious rate of interest, void in its inception under New York law. Respondent further argues that the involuntary petition should be dismissed since the petitioning creditor has failed to meet the requirements of Section 303(b). Kings contends that the relationship between the contestants is that of joint venturers, to which the usury laws do not apply, and that therefore it is an eligible creditor. Accordingly, Kings asserts that the involuntary petition against York should stand because the threshold requirement of three creditors under Code Section 303(b) has been fulfilled. The issue before the Court is whether the disputed transaction is most appropriately characterized as a joint venture or as a loan. There is no dispute as to whether or not York is generally not paying debts as they become due. It simply is not. See Code Section 303(h)(1).

### I. Factual Background

Kings and York are both antiques dealers who enjoyed a pre-petition business rela-

---

1. Section 303(b) of the United States Bankruptcy Code provides that:

(b) An involuntary case is commenced by the filing with the bankruptcy court of a petition under Chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims;

(3) if such person is a partnership—

(A) by fewer than all of the general partners in such partnership; or

(B) if relief has been ordered under this title with respect to all of the general partners in such partnership, by a general partner in such partnership, the trustee of such a general partner, or a holder of a claim against such partnership; or

(4) by a foreign representative of the estate in a foreign proceeding concerning such person.

tionship. On February 5, 1982, York borrowed $50,000 from Kings for an undisclosed purpose. The loan money was paid by check to York. Apparently, there was no interest demanded on the loan. In mid-February 1982, York's president, Frederick Rotondo ("Rotondo") approached Kings' president, Richard Hall ("Hall") with a business proposition involving another antiques store, M & M Antiques, ("M & M") which was selling its entire inventory of antiques and malachite objects. York claims that because it did not have the financial wherewithal to consummate the transaction with M & M, it inquired whether Kings wanted to pool its resources with York's resources and be York's partner. York offered to put up $225,000 and told Hall that Kings would have to contribute $350,000. Hall expressed interest in the venture and examined the merchandise in question as well as relevant inventory sheets at M & M's premises prior to furnishing any funds toward the purchase. Kings was advised that the resale of the merchandise potentially could realize $1,000,000 and that York's and Kings' $575,000 investment would realize a maximum profit of $200,000 each and a minimum profit of $100,000 each.

Hall testified that before Kings provided the funds to York, Rotondo had advised him that it would be difficult to divide the lots of merchandise. Transcript ("Tr.") at 71. According to Hall, Rotondo, in order to satisfy him, offered Kings a guaranteed profit of $100,000, with the understanding that both parties would remain obligated to promote the sale of merchandise to customers unfamiliar to York. Tr. at 72. On February 19, 1982, Kings advanced $300,000 by check to York; upon the face of this check was noted "Merch." for merchandise. The remaining $50,000 was provided by crediting the loan of February 5, 1982, which had become due in the meantime. On the same day that Kings advanced the $300,000, York drew up and signed four promissory notes for $450,000 as follows:

$ 75,000 due March 1982

$125,000 due April 1982

$125,000 due May 1982

$125,000 due June 1982

Hall asserted that Rotondo structured the notes for $100,000 more than Kings' contribution to include the $100,000 profit guaranteed to Kings by York. Tr. at 76. On cross-examination, Rotondo claimed that the $100,000 represented interest on the $350,000 advanced by Kings. Tr. at 158. These notes are the only memorialization of the contestants' transaction, and do not reveal either its nature or the contestants' intentions.

In June 1982, York defaulted on the balance of the notes after paying $250,000. At that point, York still owed Kings $200,000. According to testimony adduced at trial, Rotondo gave Kings 39 lots of malachite objects remaining in Rotondo's office as collateral on the $200,000 balance and told Kings to sell the malachite if it could. Tr. at 19. One piece of this malachite was sold for $950, which was deposited in Kings' account. Tr. at 114.

In mid-August, 1982, Kings returned the malachite objects to York because Rotondo claimed to have found a buyer. Donald King, Kings' other principal, drew up four new promissory notes in the following denominations:

$50,000 due September 20, 1982

$50,000 due October 18, 1982

$50,000 due November 19, 1982

$75,000 due December 20, 1982

Rotondo personally guaranteed these notes and promised to pay 24% annual interest if York defaulted.

The testimony reveals that at the end of August 1982, Kings learned at a creditors' meeting that York was $1,200,000 in debt. Kings asserts that it was at this time that York's attorney warned Kings that if Kings created a disturbance, York would claim that the transaction was a usurious loan. Tr. at 101.

Both petitioning creditor and respondent have failed to clarify the nature of their dealings with each other. After due consideration of the law and facts, this Court concludes that the transaction at issue is a

joint venture. The factors emerging from credible testimony adduced at trial and found persuasive by this Court are as follows:

1. The contestants are both antiques dealers;

2. Antiques dealers commonly pool their resources to purchase substantial lots of merchandise as joint venturers (Tr. at 57);

3. Kings examined the merchandise and inventory sheets prior to furnishing funds for the venture (Tr. at 62);

4. Kings was advised of maximum and minimum profits expected from the resale of the merchandise (Tr. at 16, 59);

5. The $300,000 check from Kings to York had "Merch." written on its face (Tr. at 75, 113);

6. The $350,000 advanced by Kings was in fact used to purchase the merchandise in question (Tr. at 18–19, 114);

7. Kings assisted York in transporting the merchandise to York's premises without charge to York (Tr. at 79–80, 112–13);

8. Kings and York discussed methods of reselling the merchandise so as to realize a maximum profit (Tr. at 17, 21–22, 82–83);

9. Kings exerted substantial efforts to promote and sell the merchandise without regularly receiving any commissions from York (Tr. at 80–81).

## II. *Discussion of Law*

Most courts agree that it is easier to define a joint venture than to recognize one. In *U.S. v. Standard Oil Co. of California,* 155 F.Supp. 121 (S.D.N.Y.1959), the court noted that a finding of joint venture depended on the facts of the case " 'and owing to the multifariousness of facts, no case of coadventure rises higher than a persuasive precedent for another.' " *Id.* at 148 (quoting *Harris v. Morse,* 54 F.2d 109, 113 (S.D.N.Y.1931)). There is, nevertheless, general agreement among New York courts that the following are common characteris-

tics or badges of a joint venture: the existence of a contract showing the parties' intent to be joint venturers; contribution by both parties to the joint undertaking; a minimum degree of joint control over the undertaking; and sharing of profits and losses. *See Yonofsky v. Wernick,* 362 F.Supp. 1005, 1031–32 (S.D.N.Y.1973).

The contract showing the parties' intent to be joint venturers may be express or implied, *Allen Chase & Co. v. White, Weld & Co.,* 311 F.Supp. 1253, 1259 (S.D.N.Y.1970). Absent an express contract, courts have inferred a joint venture agreement from the parties' conduct. *Chalmers v. Eaton Corp.,* 71 A.D.2d 721, 722, 419 N.Y.S.2d 217, 219 (3d Dept.1979).

The only writings which memorialize the contestants' agreement in this case are the series of promissory notes and the letter of August 16, 1982 from Hall to Rotondo detailing the payment schedule and the method of dividing the proceeds from any merchandise sold. The contestants' failure to draft any other pertinent writing requires the Court to look to their conduct to ascertain their intent.

The testimony adduced at trial reveals a clear inference that Kings and York originally intended to be coventurers for the purpose of selling the inventory bought from M & M. Tr. at 15, 67–68. If York intended to be something other than a coventurer at a later point, it has failed clearly to impress this change in position upon the Court, as was its burden to do. *See, e.g., White v. Benjamin,* 138 N.Y. 623, 624, 33 N.E. 1037, 1038 (1893) (proponent of usury defense "must establish it by clear and satisfactory evidence."); *Crawford v. Carlton,* 73 A.D.2d 530, 531, 422 N.Y.S.2d 402, 402 (1st Dept. 1979) (mem.) (borrower bears burden of proving usurious loan); *Salter v. Havivi,* 30 Misc.2d 251, 259, 215 N.Y.S.2d 913, 919 (Sup.Ct.N.Y. County 1961) (declaring that proponent of usury defense bears burden of proof on that defense).

The contributions made by the parties in furtherance of the joint venture also may take different forms: for example, one coventurer may finance a transaction while the other coventurer offers his services in

return for a share of the profits. *Ramirez v. Goldberg,* 82 A.D.2d 850, 852, 439 N.Y. S.2d 959, 961 (2d Dept.1981). "[T]here must be some combination of property, financial resources, effort, skill or knowledge," *Yonofsky v. Wernick,* 362 F.Supp. 1005, 1031 (S.D.N.Y.1973) (*citing Wagner v. Derecktor,* 306 N.Y. 386, 390, 118 N.E.2d 570, 572 (1954)), to support a finding of joint venture.

In the case at bar, Kings' principal responsibility was to provide capital for the venture and secondarily, to find customers for the merchandise. These responsibilities satisfy the second requisite for a finding of joint venture, a contribution by both parties toward the furtherance of the transaction. This finding of contribution by both parties also weakens York's loan theory, for in the usual loan situation, the lender bears no responsibility to take steps to insure repayment of the loan by helping the borrower's business succeed.

The requirement of joint control is satisfied by the aspect of both contestants' arrangement whereby both had the duty to solicit customers to purchase the merchandise, as well as by the transfer of the malachite objects between York's and Kings' premises when they were attempting to sell it.

The requirement of a sharing of profits and losses does not necessarily require that both parties have money at risk. This joint venture requirement may be satisfied by one coventurer risking the loss of the value of the services he has offered in furtherance of the joint venture. *See Marston v. Gould,* 69 N.Y. 220, 224–25 (1877); *Ramirez v. Goldberg,* 82 A.D.2d 850, 852, 439 N.Y. S.2d 959, 961 (2d Dept.1981). In the case at bar, this element of joint venture is satisfied by the findings that both contestants expended their efforts in seeking out potential buyers and that Kings contributed funds to the venture. The success or failure of the venture depended upon this combination of resources.

York's claim that the transaction was a loan at a usurious interest rate appears compelling at first blush because joint venturers do not usually personally guarantee

each other a profit. This guarantee, however, does not of itself vitiate a joint venture theory. *See Orvis v. Curtiss,* 157 N.Y. 657, 52 N.E. 690 (1899); *Salter v. Havivi,* 30 Misc.2d 251, 215 N.Y.S.2d 913 (Sup.Ct.N.Y. Co.1961). Furthermore, when a transaction is capable of definition as usurious or nonusurious, the preferred construction is that the transaction is nonusurious. *Salter, supra,* at 915.

### III. *Conclusion*

When all the evidence is pieced together, it is apparent to this Court that the contestants made a loosely defined arrangement in anticipation of realizing a large profit from the sale of M & M's inventory. Scant regard was paid to formalizing the relationship. Based upon the foregoing analysis this Court holds that Kings' claim against respondent arose out of a joint venture agreement and not by reason of a loan or forbearance of money, and that Kings qualifies as a creditor under Section 303(b) of the Code. Accordingly, respondent's defense and the counterclaim for damages under Section 303(i) of the Code are dismissed with prejudice and an order for relief may be entered.

It is so ordered.