## HARRIS v. MORSE.

District Court, S. D. New York.
Sept. 4, 1931.

110

Root, Clark, Buckner & Ballantine, of New York City (Emory R. Buckner, of New York City, Morris Townley, of Chicago, Ill., and Samuel S. Isseks, of Brooklyn, N. Y., of counsel), for plaintiff.

Laughlin, Gerard, Bowers & Halpin, of New York City (Frank C. Laughlin, of New York City, W. Tracy Alden, of Chicago, Ill., and Joseph W. Kirkpatrick and Stewart W. Bowers, both of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My decision in this case is that the bill of complaint must be dismissed, with costs.

I. This is a suit in equity praying to have a trust in favor of the plaintiff, Harris, impressed on eighty-five thousand shares of stock, now owned by the defendant Morse, in the Addressograph International Corporation, a Delaware corporation, on the ground that these shares are the resultant profit to Morse through various corporate metamorphoses, as one of four participants in a coadventure initiated to secure the stock of the Addressograph Company, a corporation of Illinois.

The associates of this coadventure, in addition to the defendant, were John B. Russell, now deceased, Frank H. Woods, and Joseph E. Rogers.

Harris, who, when the story in this record begins, had an option on 50 per cent. of the Addressograph Company's stock, then owned by Joseph S. Duncan, claims to have had a one-quarter interest in the coadventure pursuant to an oral understanding with Russell, based on the fact that in August, 1923, Harris brought his option to Russell and endeavored to secure Russell's help in disposing of it to their mutual advantage.

The plaintiff's contention in regard to Morse is that when Russell engaged Morse to investigate and make an audit of the Addressograph Company in the latter part of August, 1923, Morse knew that Harris and Russell were engaged in a coadventure of which the purpose was to secure the control of the Addressograph Company, and that, consequently, Morse was equitably precluded from thereafter participating, to the exclusion of Harris, in the profits resulting from such control subsequently secured by Russell, Morse, Woods, and Rogers, without any contribution of money, effort, or advice from Harris.

II. The trial herein was held during the latter part of June, 1930. The events on which the plaintiff's claim against Morse is based occurred in September, 1923. Consequently the reconstruction of the facts from the evidence now available has been a task which approximates a problem in paleontology.

However, a careful study of the record which, owing to the care of trial counsel, has been admirably arranged for my convenience, has enabled me to piece together a skeleton for the case with which I am satisfied, and which, although perhaps it is not perfectly articulated, is nearly enough complete to enable me safely to infer those parts which are missing.

III. As Mr. Claude Houghton has aptly said in a recent novel, "Jonathan Scrivener": "To know the facts is one thing; to know the truth is another. Facts are to the truth what dates are to history—they record certain events, but they do not reveal the significance of those events."

This observation might almost be taken as a text for this opinion, because owing to Russell's death, the meaning of many of the events as to which evidence has been given is difficult definitely to ascertain. For in dealing with a case the decision of which is dependent on events so long past, when, as here, one of the chief actors therein is dead, the trier of the facts has a constantly recurring impression that they are being presented, as it were, ex parte—that they are having light thrown upon them from one side only, with the result that there is an impression of distortion, and an inescapable feeling arises that truth cannot be ascertainable in such a half light.

IV. This feeling is the undoubted basis of such statutory provisions as section 347 of the Civil Practice Act of New York State, which is binding on me by a federal statute, title 28, United States Code, § 631 (28 US CA § 631), and which provides, so far as here relevant, that (italics mine) : "Upon the trial of an action * * * *a party or a person interested in the event,* * * * shall not be examined as a witness in his own behalf or interest, * * * against the executor, administrator or *survivor of a deceased person* * * * *concerning a personal transaction or communication between the witness and the deceased person.*"

This statute has been held in New York courts, whose construction thereof controls mine, Central Iron & Coal Company v. Hamacher, 248 F. 50, 55 (C. C. A. 5), to preclude such evidence by a person interested in the event of a case against a surviving partner of a deceased person. Levy v. Louvre Realty Company, 222 N. Y. 14, 19, 20, 118 N. E. 207; Green v. Edick, 56 N. Y. 613; Manning v. Schmitt, 4 App. Div. 131, 38 N. Y. S. 640; Herschman et al. v. Fischer, 206 App. Div. 629, 199 N. Y. S. 45; Id., 206 App. Div. 670, 679, 199 N. Y. S. 927; Weiss v. Meyer, 95 Misc. Rep. 145, 147, 159 N. Y. S. 211.

When the trial began, I was under the impression that the plaintiff's claim here might perhaps be maintained as a direct claim against Morse, and not a claim derived through the deceased Russell; and on that theory I made a tentative ruling—subject to an exception and a motion by the defendant to strike the evidence out—that statements alleged to have been made by Russell to Harris and other witnesses with an interest in this case were admissible as declarations against interest by Russell.

On reconsideration of this ruling, I am satisfied that I was wrong, for, however the plaintiff's case is looked at, his right, if any, against Morse is derivative and comes only through Russell.

Consequently, I hold that the plaintiff, his son, Sanford Harris, and Miss Strain, were incompetent to testify to statements made to them by Russell in regard to the plaintiff's interest with him in the original option given to him by Duncan on the Addressograph's stock, or as to any other matters concerning it.

As a result of my present ruling, I have wholly disregarded such evidence of these witnesses, and hereby grant the defendant's motion to strike out such parts of their evidence as relate to conversations with the deceased Russell.

V. The record having been thus purged of the evidence of witnesses rendered incompetent by section 347 of the New York Civil Practice Act, the next question with which to deal before taking up the facts further is, necessarily, the question of the credibility of witnesses, which has come to play an unusually important part in this case.

Joseph Harris, the plaintiff, and his son, Sanford Harris, did not make a very pleasing impression on me when they were on the stand. I had a feeling, whilst they were testifying, that for some reason their evidence seemed to lack candor, and not really to represent their actual positions with regard to the situation here involved at the time when the events to which they were testifying occurred.

The whole effect of their evidence was, so to speak, synthetic, and seemed to be posed so as to bring themselves as nearly as might be within a theory of the case which would be favorable to them.

I attributed this impression at first as due to the plaintiff's age and to the time which had elapsed since 1923 when the early negotiations between Harris and Russell about the Addressograph Company option occurred. But the defendant's counsel cast a baleful light on the plaintiff's whole case when they proved, to my entire satisfaction, that the alleged telephone conversation of September 22, 1923, between Harris in Chicago and Russell in New York—with Sanford Harris allegedly listening in—could not have taken place, because at the very time, when it was claimed to have occurred, Russell was en route by motor from New York to Pittston, Pa., to attend his daughter's wedding.

Now, having considered all the evidence in the case again and again, from every point of view which has occurred to me, I have made up my mind that my first impressions regarding the plaintiff and his son were entirely justified, and that I could not safely believe anything to which they testified, unless it was clearly established otherwise.

I do not, as defendant's counsel asks me to do, put the plaintiff and his son in the class of deliberate perjurers. What I do think, however, is that by pondering on and discussing together what they conceived to be their grievances, first against Russell, and latterly against Morse, they had, at the time of the trial, by a kind of process of mutual mental

massage, come actually to believe that the telephone conversation, and anything else which they considered would conduce to the advantage of their case, had occurred, and if in doubt they gave themselves the benefit thereof, because Russell's lips were sealed by death.

Furthermore, I think that the same observations are fairly applicable to the other witnesses called by the plaintiff who may be considered to have been identified with his interest, for there seems to be a somewhat choral quality in the evidence which they have given on all points regarded by them as of importance.

So far as the defendant Morse is concerned, it is quite true that apparently he made some mistakes in his evidence, and that his evidence on this trial differed in some particulars from the evidence given by him in the trial at Chicago between Harris and Russell's Illinois administrator, which has now been dismissed by the Illinois courts, on the ground that, as Russell was a resident of Pennsylvania, and his executors had qualified there, the shares of stock owned by Russell in the Addressograph Company of Delaware, against which it was sought to impress a trust, did not have any situs in Illinois, and, consequently, his Illinois administrator had not any title thereto which could be trusteed by the courts of Illinois. Harris v. Chicago Title & Trust Company, Administrator, 338 Ill. 245, 266, 170 N. E. 285.

Aside, however, from Mr. Morse's lapse into bad taste, in somewhat sneeringly volunteering—apparently to imply the limited financial resources of Harris—that he had been astonished and amused to see Miss Strain, secretary to Mr. Harris, assisting in serving the meal one evening when he was at the Harris apartment in Chicago, I do not find anything exceptionable in his evidence. His mistakes were all reasonably explainable, owing to the time that had intervened between the trial and the events to which he was testifying.

■ But even if Harris and Morse must both be regarded as equally self-serving in their testimony, it must not be forgotten that the plaintiff in a case of this kind, on the issues as here raised, has the burden of proof, Chapman v. Dwyer, 40 F.(2d) 468, 471 (C. C. A. 2), and naturally, owing to the drastic nature of the remedy sought, that burden must go far beyond a mere preponderance of the evidence. Pomeroy, Equity Jurisprudence, vol. 3, p. 2421, and cases there cited.

If, therefore, Harris and Morse are to be considered as equally unreliable witnesses, Harris, as plaintiff, must fail, in the absence of other evidence which would maintain the thesis of his case.

It is contended by plaintiff's counsel, however, that the evidence, given by Morse in the trial between Harris and Russell's administrator in Chicago and in the trial here, has shown that Morse was from the first in a fiduciary relationship with Harris, that his subsequent actions in the Addressograph situation were in derogation of this relationship, and, hence, though not fraudulent in fact, they were fraudulent in the eyes of equity, and so gave Harris a right to maintain this action against him as a trustee de son tort.

For the reasons hereinafter given, I do not agree to this construction of the situation before me.

■ VI. The right in equity of so-called co-adventurers to the impression of a trust on or to an accounting for profits made by a treacherous or deserting member of their joint company has been much developed in this country, especially in recent years, under analogies to the law of partnership. It is a basis of equitable jurisdiction which seems to me to be still, more or less, in a formative stage of its development, and as I read the cases I think that the chancellor's foot is more often in evidence than it should be in matters not purely discretionary.

There are, as Professor Holland long ago pointed out in his admirable book on "Jurisprudence," only two kinds of substantive rights recognized by our courts:

(1) Substantive rights in rem, such as the right a man has not to be intentionally or negligently damaged in his person, property or reputation; and

(2) Substantive rights in personam, which, for my present purposes, are sufficiently defined as rights created by the parties to them, owing to their agreements with or their acts toward one another.

Examples of these are the rights arising from contracts and from trusts, and the other personal relationships, falling short of contract, which equity recognizes.

It is of course elementary, however, that the transfer of a defendant's property to a plaintiff should never occur, or any other form of remedy be given to a plaintiff, unless there has been a clear breach of some substantive right of the plaintiff which is recognized either by the law or by the more sensi-

tive conscience of equity as creating a juristic nexus between him and the defendant which a court will protect by an appropriate remedy.

The pivotal question before me, therefore, is whether any such nexus between the plaintiff and defendant has been established herein.

This case is, I think, the most interesting with which I have ever had to deal, either during my twenty-five years at the bar, or in my short service on the bench.

I have reflected much on it, and I cannot feel the confidence in the plaintiff's contention which is necessary to enable me candidly to state that he has persuaded me that he had any substantive right against Morse, even of the somewhat tenuous nature, which seems to be sufficient in suits of this kind, to found the remedy now sought by him.

Concededly there was not any contract relation between Harris and Morse, and it is, therefore, necessary to determine whether any direct relationship of a fiduciary nature between Harris and the defendant Morse has been made out.

■ VII. Each case in which a coadventure is claimed and a trust is sought to be declared against a defendant depends of course for its result on its own facts, and owing to the multifariousness of facts, no case of coadventure rises higher than a persuasive precedent for another.

I have read the authorities dealing with coadventure which have been cited to me in the briefs of counsel in this case with care, and I think that there is a lowest common denominator to all such of them as I should be willing to consider to have been correctly decided.

The common denominator to which I refer is that any defendant against whom relief has been granted, has from his first connection with the coadventure, or with the situation that has eventuated into the coadventure, occupied knowingly and consciously toward the successful plaintiff some kind of relationship in which equity recognizes fiduciary obligations.

Indeed, this principle seems to be admitted by the plaintiff in the thirteenth paragraph of his complaint wherein he explains his omission of Woods and Rogers as parties defendant thereto.

■ The plaintiff here, therefore, in order to bring himself within what I regard as a proper doctrine for his case, must make out a fiduciary relationship in limine between himself and Morse, commencing when Morse was first called in by Russell to help him investigate the Addressograph Company and to make an audit thereof.

Here I think the plaintiff has wholly failed.

Morse knew, of course, at the beginning, that Harris had an option on Duncan's Addressograph shares, but I find that he was never told, and did not know, that Harris had agreed to pay one-quarter of the audit, or that Harris had any other agreement with Russell, if indeed he had.

I feel confirmed in this belief by what appears to me to have been the relation between Harris and Russell when Morse was first sent out to Chicago.

I do not feel any hesitation in saying that Harris and Russell never intended to embark on the joint adventure which is the subject-matter of the present action, namely, of buying 50 per cent. of the stock of the Addressograph Company, and then getting control of all the stock thereof by a process of attrition worked out through the medium of litigation with the owners of the other 50 per cent. of the stock.

I think that the first inference to make from the evidence, properly admitted, is that Harris, who had held the option since April 20, 1923, and had been unsuccessful in trying to sell it, approached Russell to see whether Russell would take the option over and find a buyer for it. I think this theory of their relation finds strong support in Russell's telegram to Harris of August 13, 1923, put in evidence by the plaintiff, in which Russell says: "Have arranged to send auditor immediately, upon the understanding with you that you deal with no one else during our negotiations until such time as I accept or reject proposition. Am writing. Wire your acceptance of understanding and confirm in writing."

That telegram certainly does not sound in coadventure, if I may so express it.

It takes at least two to make a coadventure, and from Russell's point of view, evidently he and Harris were dealing at arm's length at that time.

Russell was in effect demanding an option on Harris' option, and apparently did not then regard himself as committed in any way except perhaps to the contingent extent that, if he did take over the option and if he did sell it, Harris was, as Miss Brush Ellis, Rus-

sell's secretary, said, to have one-quarter of the profits, provided he paid one-quarter of the auditing expenses as he agreed to do.

I find, therefore, that Morse was engaged by Russell to investigate the Addressograph situation and make an audit of that company from the point of view of an accountant for Russell only.

Vis-à-vis Russell, he was, of course, in a fiduciary position so soon as Russell asked him to go to Chicago and he agreed to do so; but he was not at that time in any fiduciary relationship with Harris, because he was looking to Russell only as his employer, and in fact was Russell's man until later Russell took him in as a coadventurer.

Morse, therefore, was brought into the situation by Russell without, so far as Harris was concerned, any basis for any limitation in equity or fair dealing of his freedom of action.

That being so, any information which he might have secured about the Addressograph Company was secured as Russell's agent only, and not as the agent of Harris; and any knowledge which he may have secured thereafter of Harris' connection with the matter would not effect any change in his initial status as being bound in fiduciary relationship to Russell only. Cf. Lougee v. Pickrell et al., 250 F. 737, 738, 740 (C. C. A. 6); Steinbeck v. Bon Homme Mining Company, 152 F. 333, 338 (C. C. A. 8).

In the last-mentioned case Judge Sanborn, who was one of our great equity judges, in considering the basis of equitable relief by imposing a constructive trust, said, 152 F. at page 338: "A constructive trust of this nature is a creation of a court of equity. But such a court never raises it unless the holder of the title has been guilty of some breach of duty; for 'a court of equity can act only on the conscience of a party. If he has done nothing that taints it, no demand can attach upon it so as to give any jurisdiction.'"

I find, for the reasons stated, that Morse's conscience was free, and, consequently, that he had a right to act as he did, when he started in with Russell to secure an option on Duncan's Addressograph shares in their joint behalf.

VIII. In case, however the appellate courts should differ with me on this construction of the situation, there are other circumstances which, I think, also fully support my decision for the defendant.

The fact that 50 per cent. of the Addressograph Company of Illinois was owned by what have been referred to throughout the record as the "Hall interests," who were somewhat antagonistic to Duncan—on whose 50 per cent. of the stock Harris had the option—was a danger signal to any man who contemplated a satisfactory status in the company by purchasing Duncan's shares. That was the reason why Harris was unable to sell his option and why, after Russell and Morse had secured the option of October 5, 1923, from Duncan, they were unable to interest any of the bankers to whom they tried to sell it.

It was only after Mr. Woods, who apparently had been the successful leader of many similar affairs, stimulated them in the first part of 1924 to a joint endeavor to get the stock for themselves, that the coadventure here involved took form, and a campaign was begun which, after varying fortunes, finally resulted in success.

I think that, as above implied, if there was any purpose between Russell and Harris in August, 1923, to enter into a coadventure, it was inchoate only and was in connection only with the sale of the Harris option to others, and, consequently, the purpose of the coadventure, if any, terminated on September 15, 1923, when its subject-matter (the option), after a somewhat informal renewal, ended. Cf. Harris v. Umsted, 79 Ark. 499, 96 S. W. 146, 147; Commercial Bank v. Weldon, 148 Cal. 601, 84 P. 171, 174, 175.

But, however that may be, Harris' connection with the situation, with the status of a coadventurer of any kind therein, was certainly terminated finally by him on September 22, 1923, the day after the alleged but disproved telephone conversation between Harris in Chicago and Russell in New York, when Duncan—who was at arm's length with the lot of them and quite free to deal with whom he chose—at a meeting with the Harris interests to which, as I find, he had been summoned by Harris, refused to renew any option to Harris.

This meeting should, perhaps, be further noticed. On Tuesday, September 18, Harris had received a telegram from New York, from Russell, who had just seen Duncan there, reading: "Duncan left on Century. Absolutely refuses to renew Harris option. He was very frank regarding all matters. Good people are waiting the expiration of your option. I told him it was

strictly up to him to decide whom he wanted to manage the working out of his problems. He offered to place the matter in my hands. I told him if he delivered me satisfactory agreement would take it up. Otherwise would stop and charge off our loss. Will keep you advised."

This advised Harris that Duncan was on his way back to Chicago, and as Harris' option had expired, Duncan was quite free to take the matter of the sale of his stock up with any one whom he wished.

Harris in Chicago telegraphed Russell in New York on Thursday, September 20, at 8:45 p. m., addressing the telegram to Russell's apartment, 247 Fifth avenue, as follows: "Telegram yesterday. Important I talk to you. Will telephone you Friday morning ten o'clock, New York time."

This telegram was received in New York at 9:53 p. m. on the same day, long after Russell had left for Pittston, Pa., and according to Miss Ellis, whose credibility was vouched for by both parties, was found unopened at his apartment on his return some days later.

Harris claimed to have talked to Russell in pursuance of this telegram on Friday, September 21st. I have found that he did not do so, and I think that this is confirmed by the fact that, as I have found, Harris sent, through Hollingshead, for Duncan to come to his office on Saturday, the 22d, for a conference which Harris intended to be a substitute for the failure to reach Russell by telephone.

At that conference Harris had not only his two sons, but also Miss Strain, his secretary, and Mr. Hollingshead, each of whom had a 5 per cent. interest by written contract in what Harris might make out of his option with Duncan. Thus Harris had present at this meeting all the persons interested with him in the situation. Such a group, so assembled by Harris, must have had significance.

I accept Duncan's story of this conference and find that he did not offer to give Harris a new option, and that he was not requested to do so. This finding is confirmed by the fact that it clearly appears that prior to this conference Duncan had become satisfied that Harris was not a responsible person with whom to deal, and, consequently, had determined not to have anything more to do with him, and Harris, on his side, felt that he could not do anything with a further option.

I find that at this conference Harris, in the presence of his interested associates, and with their acquiescence, abdicated from the situation when he found that Duncan would not deal with him. Such an attitude on Harris' part does not, as plaintiff's counsel claim, involve any tax on one's credence for the prospect at the time was not encouraging.

If there was then any element of coadventure in it—to which I do not agree—that ended the Harris connection with it.

Realizing that he could not get further with Duncan himself, Harris urged Duncan to go back to Russell, and arranged for Duncan to write a letter to Russell, sending a copy to Harris confirming his advice.

This was the best course that Harris and his interests could pursue, because Russell was an old friend, and Harris felt, undoubtedly, that if Russell took the matter up again and succeeded in doing anything with it, he would, in the event Russell made any money out of the matter, be given something for having brought the matter first to Russell's attention, and then having urged Duncan to go on dealing with him.

Thereafter, it is obvious that Harris' role was that of a spectator from whom Russell did not attempt to conceal any of the steps that were being taken in the Addressograph matter, first by him and Morse, then by him with Morse and Woods together, and then by the three with Rogers added.

The friendship between Russell and Harris remained unchanged, and I believe that after the option expired—certainly after the conference with Duncan—Harris realized his new role.

I find, indeed, that his whole attitude is confirmatory of my belief.

■ It is a settled rule of construction that if the terms of a written contract are doubtful, a contemporaneous construction put on it by the acts of the parties will control. Such a rule of construction is a fortiori appropriate in the case of a vague and amorphous situation such as is involved in this case.

It is common ground, as shown by the exhibits and the evidence, that after Duncan took up negotiations with Russell, Harris was aware of the principal steps taken in the Addressograph campaign. It is true that Russell did not make reports to him. There was not, indeed, any reason why he should do so. But Harris was not kept in the dark except, perhaps, as to minor details. Yet, knowing that Morse was engaged in the Addressograph campaign, he stood mute for years in Chicago, and did not make any articulate claim on Morse that he was a par-

ticipant in the adventure until he brought this suit, although he knew Morse's address in New York and could easily have communicated with him there, or on the many occasions when Morse was in Chicago. It is noteworthy in this connection that one of the allegations of wrongdoing on Russell's part in the suit brought by Harris against him in Chicago was that Russell had never informed Morse of the alleged interest of Harris in the Addressograph situation.

I think that Harris realized, after he had relinquished the matter and Russell had taken it up, that he was no longer a participant in whatever was going forward, and that the best he could hope for was some financial recognition by Russell if the adventure on which Russell and his correlates were engaged proved successful. This seems to have been Russell's position also.

In this connection I was very much impressed with the evidence of Mr. Woods in regard to his talk with Harris, when the latter was complaining of Russell's treatment of him in not giving him any memorandum in writing as to what Harris might get if the Addressograph situation turned out well. If Harris had then claimed an "interest" or a "share" in the Addressograph situation, or made any claim, which would have implied that he was a participant, I feel certain that Mr. Woods, who was a lawyer with an unusually extensive experience in matters similar to this, would have remembered such a claim. It is clear from Mr. Woods' evidence that Harris did not make any such claim, and so I find.

Further, to emphasize the construction put on the situation both by Russell and Harris, Harris, after a talk with Russell about Addressograph matters, wrote him on July 7, 1924, and referred to a talk which they had had as "entirely satisfactory." Certainly it is not reasonably inferable that Russell, who on February 15, 1924, had paid $83,333 to Duncan on account of the purchase price of Duncan's shares in accordance with his contract of that date, could have admitted that Harris had a quarter interest in the situation as a participating coadventurer in dereliction of his loyalties to Morse and Woods, who had paid Duncan similar amounts and who had the right to choose their coadventurers.

But whatever was said, the letter not only shows that what Russell said satisfied Harris, except for the fact that it was not in writing; but it also shows—which is far more important in the case—that Harris was looking to Russell alone, even at that late date, for anything which he was to receive from a successful issue of the situation, and that Russell was responsive.

What the precise arrangement between Harris and Russell may have been is not for me to determine here. Probably it never will be known. But whatever it was it can concern the Russell estate only. Cf. Nirdlinger v. Bernheimer, 133 N. Y. 45, 30 N. E. 561.

IX. It is difficult to reconstruct past events and chancer their value in a situation such as has been here presented. I feel, however, that my reconstruction of them is approximately correct. Certain it is that a court of equity, with such a belief in regard to it as I have, could not possibly grant the relief which the plaintiff here seeks.

As Judge Thomas said in an admiralty case, The Baron Innerdale (D. C.) 93 F. 492, at page 493, in dealing with the question whether a plaintiff had sustained the burden of proof: "Courts are required to examine, compare, analyze, infer, weigh, and strike the balance of probabilities; but they are not required to hazard opinions that a person has done wrong, without the presentation of intelligible and substantiated facts which tend to establish the accusation. A question of fact may be refined to such a degree that an accurate solution is beyond any reliable intellectual process. At such point of mystification, the court is justified in holding that the libellant has not sustained the burden of proof; that the domain of reasoning has been passed, and that of pure surmise entered."

That is a domain into which even a court of equity, in spite of its sensitized conscience and its plastic practice, cannot properly pass.

It is not uncommon for a man who has a grievance to endeavor to create a cause of action out of it, but this suit is perhaps unique because the plaintiff here, with a grievance against one man, is trying to erect it into a cause of action against another.

The plaintiff has, I find, entirely failed to sustain the heavy burden of proof laid on him in a case of this kind, and, consequently, this complaint must be dismissed, with costs, leaving the plaintiff to such remedy as he may be able to make out against Russell's executors in his suit now pending in the United States District Court for the Middle District of Pennsylvania.

X. I think that this opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½, Title 28,

United States Code, § 723 (28 USCA § 723), and I will sign an order so providing. Briggs v. United States, 45 F.(2d) 479, 480 (C. C. A. 6); Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618. Cf. The El Sol (D. C.) 45 F.(2d) 852, 856, 857.

Such an order and a decree dismissing the complaint with costs may be presented for my signature on three days' notice to the opposing party.