**In re PCH ASSOCIATES, f/k/a Simon Associates, Debtor.**

**PCH ASSOCIATES, Plaintiff,**

**v.**

**LIONA CORPORATION N.V., Defendant.**

**Bankruptcy No. 84 B 11540.**
**Adv. No. 85–5025A.**

United States Bankruptcy Court, S.D. New York.

Nov. 25, 1985.

Levin, Weintraub & Crames, and Gelberg & Abrams, New York City, for debtor; Andrew Kress, Marc S. Kirschner and Darren H. Goldstein, New York City, of counsel.

Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Winick & Rich, New York

City, for Liona Corp.; Michael L. Temin, Philadelphia, Pa., and Jeffrey Rich, New York City, of counsel.

Stroock, Stroock & Lavan, New York City, for Creditors Committee; Barbara Kaplan, New York City, of counsel.

## DECISION AND ORDER ON DEBTOR'S MOTION FOR DECLARATORY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

This adversary proceeding in the form of a request for declaratory relief was instituted to obtain a judicial determination of the nature of, and the obligations created under, an agreement that was sharply tailored by sophisticated parties to achieve their various real estate taxation and investment goals. In short, a real estate deal was conceived and structured to acquire the land and building of what is described as the largest hotel in Philadelphia, Pennsylvania, from its sole owner.

### Procedural Posture

PCH Associates, the debtor herein ("PCH" or "the debtor") filed a petition for reorganization on November 2, 1984, under § 301 of the Bankruptcy Reform Act of 1978 ("the Code"), as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984. The debtor has continued to operate its business as a debtor in possession pursuant to Code §§ 1107 and 1108. The instant action seeking a declaratory judgment arose against the backdrop of an application made by Liona Corporation, N.V. ("Liona") seeking an order directing PCH to perform its obligations as required by Code §§ 365(d)(3) and (4) under an agreement denominated a "Ground Lease," and for adequate protection under Code § 363(e). Less than one month after Liona made its application, PCH commenced this adversary proceeding seeking a judgment decreeing that the Ground Lease is not an unexpired lease under which PCH is a tenant within the scope of Code § 365.[1] Instead, PCH urged the court to find that the Ground Lease is a joint venture agreement or a subordinated financing agreement and to determine the nature of PCH's obligations under the Ground Lease. Because Liona's initial motion and PCH's adversary proceeding raise "common questions of law or fact," this court is considering Liona's motion and PCH's declaratory judgment action in tandem.

### Factual Background

The following facts were established at trial:[2]

PCH is a Pennsylvania limited partnership formed in 1976 under the name Simon Associates. Prior to September 24, 1981,

---

1. Code § 365(d)(3) requires that a debtor in possession timely perform all obligations under an unexpired lease of nonresidential real property until the lease is assumed or rejected. Section 365(d)(4) provides that if the lease is not timely assumed or rejected, it is deemed rejected and the nonresidential real property must immediately be surrendered to the lessor.

PCH argued, not very robustly, that because the Hotel fits the dictionary definition of a dwelling and has a multi-family dwelling license, (which, from its description, appears to be equivalent to a certificate of occupancy), the Hotel could not properly be characterized as "non-residential real property" and thus was not subject to the requirements of Code §§ 365(d)(3) and (4). According to the definitions provided in the Philadelphia, Pa., Housing Code § 7–102, the license appears to have been issued for residential purposes. See 5/15/85 Tr. at 266–67; Debtor's Brief in Support of Proposed Findings of Fact and Conclusions of Law at 38–39; Liona's Post Trial Brief in Support of Proposed Findings of Fact and Conclusions of Law at 35 n. 13 (citing incorrectly 5/15/85 Tr. at 266–67).

Alternatively, PCH argued that §§ 365(d)(3) and (4) apply only to shopping center tenants. See Debtor's Brief in Support of Proposed Findings of Fact and Conclusions of Law at 38–41. As Liona noted, the legislative history of these sections does not support the interpretations suggested by PCH. In any event, the correct characterization of the Hotel for §§ 365(d)(3) and (4) purposes need not be addressed in light of this court's holding. Furthermore, while at first blush the residential lease argument has cosmetic appeal, it fails to parse out the "Ground Lease" subject matter: an interest in the land as distinguished from the improvements thereon.

2. This Decision and Order constitutes the court's Findings of Fact and Conclusions of Law required by Fed.R.Civ.P. 52, made applicable in bankruptcy by Bankr.R. 7052.

PCH owned and operated the Philadelphia Centre Hotel in Philadelphia ("the Hotel") and held title to the land and to the improvements thereon. The current general partner of PCH is a Delaware corporation, Bernturn Corp. ("Bernturn"). The president of Bernturn is Mr. Richard Bernstein ("Bernstein"), a nationally known real estate operator and investor. At some time in 1980, Bernstein was advised that the Hotel was for sale. Bernstein analyzed the feasibility of purchasing the Hotel and determined that he would have to raise $9,000,000 in addition to existing mortgages and seller provided financing, to acquire, renovate and refurbish the Hotel, and for working capital. After they were approached by Bernstein, a group of United States investors agreed to supply $4,000,000 for the project. These investors ultimately became the new limited partners of PCH ("New Limited Partners"). Because he sought to retain all the tax benefits of depreciation of the Hotel building, Bernstein determined that the remaining $5,000,000 investment would have to come from investors who were not interested in the tax benefits that property ownership allows. Bernstein approached Fidinam, a group of financial service companies with which he was familiar, to place the investment.

At an initial meeting between Bernstein and a representative of Fidinam, the parties made their specific requirements known. Bernstein wanted to enter into a joint venture or partnership structured in a way that would allocate all tax benefits to his limited partnership. Fidinam wanted an investment that would not require its client to be involved in the management of the Hotel, that would guarantee a 12% fixed annual rate of return on its investment plus a share contingent upon the Hotel's cash flow, and that would be evidenced by ownership of tangible assets rather than paper. After ascertaining that their respective requirements and goals could be fulfilled, the parties permitted their lawyers to determine the form of the vehicle or vehicles to be used for the transaction.

The acquisition of the Hotel was divided into two parts. First, the New Limited Partners agreed to acquire all of the former general and limited partnership interests of Simon Associates, which was accomplished via an Agreement of Sale dated December 18, 1980 and amended March 25, 1981 ("the Simon Agreement"). Under the Simon Agreement, Bernstein caused Jenbrad Realty Corp., a New York corporation owned by Bernstein ("Jenbrad"), to agree to purchase the interests of the former general and limited partners of Simon Associates ("Former Partners"). Jenbrad assigned the Simon Agreement to the New Limited Partners. At the closing under the Simon Agreement on September 24, 1981, the New Limited Partners consummated the Simon Agreement by purchasing interests of the Former Partners for $7,919,365 over the existing first and second mortgages, which totalled $7,610,309. As part of the purchase price, the Former Partners took back a third mortgage through Simon-Tye Associates and 135 Ventures, Inc.

The second part of the acquisition plan required Bernstein to cause Jenbrad to enter into an agreement of sale dated August 25, 1981 ("the Sale-Leaseback Agreement") with Purchase Estates, Ltd., a New York corporation acting on behalf of Fidinam. The Sale-Leaseback Agreement provides that the land owned by Simon Associates, but not the Hotel, would be sold to Purchase Estates, Ltd. (whose interest ultimately was assigned to Liona) and immediately leased back to Simon Associates under the agreement denominated a Ground Lease dated September 24, 1981 ("the Ground Lease").

*Contentions of the Parties*

Each of the parties in egocentric fashion has highlighted provisions in the two agreements in support of its characterization of the transaction. The language used in the following provisions of the Sale-Leaseback Agreement and the Ground Lease exemplifies how the documents, like a Chinese menu, pick and choose, mix and match phraseology and legal concepts with

seeming abandon. The result is a compact that defies neat pigeonholing. For purposes of organization, the parties' contentions will be listed following each of the provisions below. PCH presented credible expert testimony that stands unrebutted by Liona that the following provisions described in paragraphs a. through h. of the Sale-Leaseback Agreement are not usually found to support a true land sale agreement. Liona, while not disputing the essential facts, argues that the agreements cannot be construed, for any purpose, except as they are formally labeled.

*Sale-Leaseback Provisions*

a. Under the Sale-Leaseback Agreement, the purchase price for the land was up to $6,000,000. Of this amount, $1,000,000 was paid as brokers' commissions. The remaining amount, $5,000,000 was defined as the "Landlord's Investment." It represented the remainder of the $9,000,000 that Bernstein had determined was necessary to accomplish the acquisition, renovation, operation and ultimate sale of the Hotel, after deducting PCH's $4,000,000 investment. 5/13/85 Tr. at 97; 5/15/85 Tr. at 349–50; 6/17/85 Tr. at 24–26. Thus Liona's investment constituted five-ninths of the total price and PCH's investment, four-ninths. The amount of Liona's investment was not related to the value of the land. 5/13/85 Tr. 97; 5/15/85 Tr. 349–50; 6/17/85 Tr. 24–26. Liona used the predetermined return on the investment in the Hotel, not the value of the property, to evaluate the value assigned to the land for purposes of the sale-leaseback transaction. 5/13/85 Tr. 99; 5/15/85 Tr. 357–58; 6/17/85 Tr. 27–28, 52. This is the opposite of a normal land sale agreement, in which an investor analyzes the purchase price based upon market conditions. 5/13/85 Tr. 99–100; 5/15/85 Tr. 351–52, 354.

b. Under certain circumstances, the purchase price and thus the amount of Liona's investment would be reduced. For example, section 6 of the Sale-Leaseback Agreement provided that if the New Limited Partners under the Simon Agreement recovered any money from the Former Part-ners of Simon Associates for any damages, Liona's investment, the price of the land, would be reduced by five-ninths of that amount. Section 6 also provided that any savings in PCH's anticipated costs of renovating and refurbishing the Hotel would be shared by Liona and PCH, by deducting five-ninths and four-ninths, respectively, of that amount from the amount of each party's investment. 5/13/85 Tr. at 104, 109. Although PCH asserts that these provisions are more indicative of an intent to form a joint venture than a landlord-tenant relationship, Liona contends that the language of the agreement clearly demonstrates the parties' intent to enter into a bona fide sale-leaseback arrangement.

c. Articles 4 and 10 of the Sale-Leaseback Agreement mandate that "Bernstein or a corporation controlled by him … be a general partner" at the time the Sale-Leaseback Agreement closed. 5/13/85 Tr. at 105. PCH believes that these provisions strongly suggest that a joint venture was intended because of the requirement of Bernstein's personal involvement. Liona asserts incongruously that only economics required the continued involvement of Bernstein subsequent to the closing of the Sale-Leaseback Agreement.

d. Section 7 of the Sale-Leaseback Agreement required Liona to put up one-half of the amount required to repay a pre-existing mortgage on the land and building.

e. Pursuant to § 5 of the Sale-Leaseback Agreement, there were no prorations or adjustments at the closing between the purchaser and seller. All adjustments were required to be made by the seller (Jenbrad). 5/14/85 Tr. 130–131. It is unusual in a true land sale agreement for there to be no prorations between purchaser and seller or for the seller to make all adjustments at the closing. 5/14/85 Tr. 131–32.

f. Pursuant to § 5 of the Sale-Leaseback Agreement, seller (Jenbrad), contrary to the usual custom in Philadelphia, paid all transfer taxes arising out of the transaction. 5/14/85 Tr. 132.

g. Pursuant to § 5 of the Sale-Leaseback Agreement, the seller (Jenbrad) was obligated to pay the premium for the purchaser's title insurance policy. It is unusual, in a true land sale agreement, for the seller to pay the premium for the purchaser's title insurance policy. 5/14/85 Tr. 134.

h. Pursuant to § 5 of the Sale-Leaseback Agreement, any savings to the seller (Jenbrad) in the expected cost of its legal fees, the transfer taxes, the title insurance premiums, or closing adjustments with its seller, were either to be applied towards the renovation of the Hotel, or shared five-ninths to Liona and four-ninths to PCH. 5/14/85 Tr. 135–36.

*Ground Lease Provisions*

The Ground Lease is a triple net lease, with PCH responsible for paying real property taxes, repairs and maintenance, utilities and insurance. PCH also established, through largely credible, unrebutted expert testimony, that the following provisions of the Ground Lease, described in paragraphs a. through m. below, are not usually found in a true lease.

a. It is unusual in a true "lease" for the tenant (as here) to solicit a prospective landlord to invest in the tenant's property. 5/15/85 Tr. 351–53.

b. The initial term of the lease was thirty-three years. PCH had an option to renew the lease for four renewal terms of thirty-three years each, making the possible term of the lease one hundred and sixty-five years. It is unusual for a true lease to provide for such a long term. 5/13/85 Tr. 103; 5/15/85 Tr. 350. The minimum annual fixed "rent" for the first twenty-four months was $600,000. During months twenty-five through thirty-six, PCH was required to pay a percentage rent determined by a formula based upon the previous year's room occupancy rate, in addition to minimum net annual rent. During months thirty-seven through the balance of the term, PCH would pay only a percentage rent based upon all increases in gross room revenue, gross food and beverage revenue and gross rental for commercial space on the premises. Liona cannot recognize any benefit from appreciation in the value of the land because the Ground Lease provides a fixed rent during the term of the lease. Ground Lease § 42.01. The fixed "rent" bears no relationship to the market value of the land; rather, it is strictly the result of trading tax benefits for a higher return from the joint venture. 5/13/85 Tr. 97, 100; 6/17/85 Tr. 12–13.

c. PCH had the option, which it exercised, to defer up to one-fourth of the monthly installments of minimum net annual rental due during the first thirty-six months of the term and to pay that deferred amount with interest on the first day of the thirty-seventh month or in twelve equal monthly installments thereafter. As a result, Liona would at all times, even though payments were deferred, receive its agreed 12% rate of return on its amount invested. Ground Lease § 3.01; 5/13/85 Tr. 110–12. PCH believes that because the minimum net annual rent is based upon a fixed return on Liona's investment (which was not tied to the actual value of the land,) that the term "rent" is a misleading characterization that does not weaken PCH's assertion that the parties were co-venturers. Liona states "rent is rent" and this provision demonstrates that the parties intended to establish a landlord-tenant relationship.

d. Landlord's Investment under the Ground Lease was subject to reduction by any savings in refurbishing costs and damage claims against the Former Partners, pro rata to the respective investments of Liona and PCH (five-ninths to Liona, four-ninths to PCH). If the Landlord's Investment decreased because of savings in refurbishing costs and damage claims against former partners, § 3.04 of the Ground Lease provided that the fixed "rent" would be reduced to an amount equal to 12% of the reduced Landlord's Investment. PCH observes that because the amount of rent under the Ground Lease is based upon the amount of Liona's investment rather than upon the value of the land, Liona has no true interest in the land despite the fact that it holds record

title. Liona contends that the Deed of Sale which indicates that Liona is the fee owner speaks for itself, and supports Liona's contention that the parties entered into a bona fide sale-leaseback agreement that established a landlord-tenant relationship.

e. Article 7 of the Ground Lease requires PCH to insure the property the way an owner of similar property would. PCH claims this indicates joint venture intent. Liona notes that this type of insurance provision is widely used in commercial leases and indicates the parties' intent to create a landlord-tenant relationship.

f. PCH has the option under § 12.10 of the Ground Lease of prepaying the Landlord's Investment, thereby terminating its obligation to pay any fixed rent.

g. Article 27 of the Ground Lease does not apportion condemnation awards according to the relative value of the land or the building, or according to the unexpired portion of the lease. Rather, such awards would be shared pro rata to the parties' investment, five-ninths to Liona, four-ninths to PCH, until the Landlord's Investment is recovered. Thereafter, condemnation awards are shared equally. Furthermore, any condemnation award would be credited against Liona's investment, which would reduce the amount of rent.

h. Pursuant to §§ 12.04 and 40.01 of the Ground Lease, Liona's position is subordinated to all existing mortgages on the land and Hotel, and to all renewals, modifications and extensions thereof. Pursuant to § 12.04, Liona's position may be subordinated to future financing. 5/13/85 Tr. 116–17.

i. Liona, under certain circumstances, would share equally in the benefits of PCH's savings of debt service costs, if any, and would be subject to the detriments of increased debt service costs, if any. Ground Lease §§ 12.08(b), 12.08(d); 5/13/85 Tr. 117–18. Either Liona or PCH could arrange the refinancing that would trigger these provisions; the burdens or benefits would be shared equally. 5/13/85 Tr. 118–19.

j. Neither PCH nor any partner or principal, disclosed or undisclosed, is personally liable for any payments to Liona. Ground Lease § 49.01. Moreover, PCH is not required to post a security deposit with Liona. 5/13/85 Tr. 124.

k. A great deal of control over the Hotel operations was to shift to Liona depending upon whether Bernstein remained a controlling person of PCH. Bernstein must remain a controlling person in order for PCH to retain the right not to have to deposit Impositions with Liona pursuant to Article 5 and § 4.04(a)(iii), or security pursuant to §§ 14.02(b)(i) and (iii); the right to pay Impositions pursuant to § 4.01 when due, rather than thirty days prior to the due date; the right to adjust insurance proceeds pursuant to § 7.02(g) without Liona's participation; the right to select an architect, engineer or general contractor pursuant to §§ 8.02, 9(a) and 14.02(c) without Liona's consent; and the right to make payments to Liona pursuant to §§ 25.01(a) and (b) within thirty days of notice, rather than ten days. Ground Lease § 48.12. All the foregoing provisions involve substantial economic disincentive for Bernstein to withdraw from PCH. 5/15/85 Tr. 293–311.

l. Pursuant to Articles 11 and 46, both parties have an option to purchase the other's interest if either party receives a bona fide offer from a third party. 5/13/85 Tr. 119–20.

m. Liona participates under § 3.02 of the Ground Lease in a percentage of Hotel room rates, and after the repayment of the Landlord's Investment, Liona shares in net cash flow of the Hotel (after all expenses) on an equal basis with PCH. Thus, after repayment of the Landlord's Investment, if the Hotel makes little or no money, Liona will receive little or no money, but if the Hotel prospers, Liona will share 50% of its net cash flow.

### Issues Presented

As the facts and the above-enumerated provisions indicate, the parties' agreement is ambiguous in that it is susceptible of

multiple interpretations. The following issues are thus presented:

1. Whether Pennsylvania or New York law governs the construction of the agreements;

2. Whether parol evidence is admissible to determine the parties' intent;

3. Whether the parties intended to enter into a joint venture agreement, a subordinated financing agreement or a landlord-tenant relationship;

4. What obligations the debtor has under the Ground Lease.

Based upon the following analysis, the court finds that the nature of PCH's interest in the Hotel pursuant to the Ground Lease must be determined according to the laws of Pennsylvania, and that parol evidence is admissible to aid the court's determination of the parties' intent. The court further finds that the Ground Lease is not an unexpired lease within the scope of Bankruptcy Code § 365, but rather is a joint venture agreement.

*Discussion of Law*

A. *Pennsylvania Law Governs the Interpretation of the Ground Lease*

It is well known that a federal court sitting in diversity must apply the substantive laws of the state in which it sits, including the choice of law rules of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See also In re O.P.M. Leasing Services, Inc.*, 28 B.R. 740, 747–52 (Bankr.S.D.N.Y.1983). Thus, this court must examine New York's choice of law rules to determine what body of substantive law governs the interpretation of the Ground Lease.

In New York, the construction of a contract is governed by the laws of the place where the contract is made, absent a choice of law provision included by the parties. *In re Shangri-La Nursing Center, Inc.*, 31 B.R. 367, 370 (Bankr.E.D.N.Y.1983); *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954). Generally, choice of law provisions

are determinative provided the state chosen has sufficient contacts with the transaction. *Harves Office Systems, Inc. v. Wang Laboratories*, 537 F.Supp. 939 (E.D.N.Y. 1982). *See also* Restatement (Second) Conflicts of Law § 187 at 561 (1971).

■ In Section 48.9 of the Ground Lease, the parties selected Pennsylvania law to govern its construction. The parties' contacts with Pennsylvania are manifold: the transaction closed in Pennsylvania; the real property is located in Pennsylvania; and the debtor is a Pennsylvania limited partnership. This court is aware of no reason to disturb the parties' choice, and ample reason to enforce it. Pennsylvania law therefore governs the construction of the Ground Lease and the Sale-Leaseback Agreement.

B. *Parol Evidence Is Admissible to Determine the Parties' Intent*

■ At trial, PCH offered testimonial and real evidence as to the true intentions of the parties, over Liona's objections. This evidence consisted chiefly of three days of expert and transactional testimony by Bernstein, and a series of memoranda exchanged by the parties subsequent to their initial meeting but prior to the entry into the Ground Lease. Liona objected to the admission of this evidence based upon the merger clause contained in section 48 of the Ground Lease as well as upon Pennsylvania cases dealing with the parol evidence rule.

The parol evidence rule provides that oral or extrinsic evidence that varies or alters the terms of a written contract assented to by the parties, which is neither vague nor ambiguous, cannot be admitted into evidence absent a showing of mistake, accident or fraud. *Gianni v. R. Russell & Co., Inc.*, 281 Pa. 320, 323, 126 A. 791, 792 (1924); *Scott v. Bryn Mawr Arms*, 454 Pa. 304, 307, 312 A.2d 592, 594–95 (1973); 4 *Williston on Contracts* § 365 at 1032 (3rd ed. 1961); 3 *Corbin on Contracts* § 573 (3rd ed. 1960). The cases are myriad, however, that permit the admission of parol

evidence to explain the intent or action of the parties to a written contract when its true nature is at issue. *See, e.g., Biddle v. Biddle,* 363 Pa. 426, 429–30, 70 A.2d 281, 283 (1950); *Howell v. Wheelock,* 115 Pa.Super. 599, 602–03, 176 A. 252, 253 (1934). Intent must be determined by reference to the entire contract. *Waldman v. Shoemaker,* 367 Pa. 587, 589, 80 A.2d 776, 777 (1951), citing *Robinson v. Stover,* 320 Pa. 308, 314, 182 A. 145, 149 (1936). Furthermore, "[i]f . . . a written contract is ambiguous, oral evidence is admissible to explain the contract and to resolve the ambiguity." *Waldman,* 367 Pa. at 591, 80 A.2d at 778, citing *Security Trust Co. of Pottstown v. Stapp,* 332 Pa. 9, 13, 1 A.2d 236 (1938); *Kittaning Coal Co. v. Moore,* 362 Pa. 128, 66 A.2d 273 (1949).

Liona in its memoranda and at trial maintained that the parties' actions, the Ground Lease provisions, and the Pennsylvania authority cited by the debtor all support Liona's assertion that parol evidence is inadmissible here. Liona first attempted to distinguish the various cases cited by PCH allowing parol evidence on the ground that those cases dealt with leases that were in reality intended to be security devices, *see, e.g., In re 776 Third Avenue Holding Corp.,* 340 F.2d 42, 46 (2d Cir.1964), *cert. denied,* 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965), whereas the Ground Lease at issue "clearly" is a lease. Next, Liona attempted to distinguish authority PCH cited suggesting parol evidence is admissible to demonstrate that a transfer absolute on its face was in reality intended as security for repayment of a debt, *see, e.g., Nath v. Nat'l Equipment Leasing Corp.,* 282 Pa.Super. 142, 422 A.2d 868 (1980), *aff'd,* 497 Pa. 126, 439 A.2d 633 (1981), based upon the fact that the property dealt with in those cases was personalty governed by the Uniform Commercial Code, whereas here, the subject property is real estate, which is governed by Pennsylvania statutory law. Finally, Liona argued that under Pennsylvania law, "title is not only material but determinative. In the absence of a writing, a deed absolute on its face cannot be transformed into a mortgage.

Parol evidence to accomplish such a result is simply inadmissible." Liona Post Trial Brief at 19. Liona placed particular emphasis on a Pennsylvania defeasance statute, 21 P.S. § 951, which provides that the only way a deed absolute on its face may be reduced to a mortgage is by a writing providing for the reconveyance of the land to the original grantor.

Liona's heroic efforts to persuade the court that the Ground Lease is completely unambiguous and perfectly reflective of the parties' intentions must fail because the court is unable to find such undistorted clarity of expression in the Ground Lease.

First, contrary to Liona's contention, the fact that § 3.01 of the Ground Lease contains a disclaimer that the parties intend the Ground Lease to be a lease and nothing else does not prevent an examination of the parties' intent in light of all of the surrounding circumstances. In *Nath v. Nat'l Equipment Leasing Corp.,* an almost identical provision in an equipment lease did not prevent the court from considering the circumstances surrounding the agreement, including the negotiations that led to its execution, and concluding that the agreement was not a true lease. *See Nath,* 282 Pa.Super. at 148, 422 A.2d at 873–75. Furthermore, this court's research and that of the parties' revealed no Pennsylvania authority, either statutory or decisional, that would render inadmissible parol evidence to show that the parties intended to enter into a joint venture as opposed to a secured financing arrangement or a landlord-tenant relationship, where the written agreement is found to be ambiguous. The Ground Lease contains provisions that fairly admit of more than one interpretation.

In determining that no ambiguity existed in the contract at issue in *Waldman v. Shoemaker,* and that that contract did not create a joint venture agreement, the court focused on the elements of a joint venture and relied upon the lack of *"control or voice or management or supervision* with respect to the purchasing, mortgaging, raising or selling of the turkeys; *nor was there any agreement, express or implied,*

*to share the losses,"* 367 Pa. at 591, 80 A.2d at 778 (emphasis in original), in reaching its conclusion. Applying a similar analysis to the instant case reveals the kind of ambiguities in the Ground Lease that go to the heart of the determination PCH has asked this court to make. For example, in light of all the surrounding circumstances, the court would be an oracle if it were not to find ambiguity of intent in provisions that require Liona's approval before PCH may take certain actions, *e.g.,* the requirement in § 9(a) of the Ground Lease that PCH obtain Liona's approval of both the architect, engineer or contractor and the specifications for certain repairs. In addition, the percentage rent provision coupled with Liona's option to become a 50% equity partner certainly point to at least an implicit agreement to share any losses resulting from a future decline in the Hotel's business. The placement of this provision in a "lease" cumulatively with other tailored provisions requires extrinsic evidence of the parties' intent given the nature of the instant dispute.

As to the Ground Lease, the term "lease" misidentifies the transaction. The nature of the transaction is dictated not by its leaselike labels and catchwords but by the intent of its terms and provisions. *See, e.g., Owakazi, Ltd. v. 107 West 86th Street Owners Corp.,* N.Y.L.J., Nov. 6, 1985, at 12, col. 3 ("Lease" must be interpreted in light of parties' intent, "object and purpose of descriptions of the business to be carried on, and then addressing the language the parties employed to reflect their negotiating objective."). The parties have conceded that so long as their individual concerns were addressed, the format memorializing their agreement could have taken any shape whatsoever. That it took the form of a Ground Lease may not now be seized upon as prima facie proof of the parties' intentions. The Restatement (Second) of Contracts states:

> The expressions and general tenor of speech used in negotiations are admissible to show the conditions existing when the writing was made, the application of the words, and the meaning or meanings

of the parties. Even though words seem on their face to have only a single possible meaning, other meanings often appear when the circumstances are disclosed.

Id., § 214, comment (b) (1981).

In light of the above-listed ambiguities, Pennsylvania law permits admission of parol evidence to aid the court's determination of the parties' intent. To reject the proffered evidence would be exalting the form of the Ground Lease over its substance, and it has been widely noted that "a court of equity may look beyond the legal form of a transaction to examine its substance...." *See Matters of Kassuba,* 562 F.2d 511, 513 (7th Cir.1977). The *Kassuba* court continued: "The substance of the transaction that a court of equity will examine is not its economic effect, which the parties determine by their agreement, but instead it is what their agreement is. What would be a contract case at law remains in equity a contract case." *Id.* at 514. Parol evidence may thus be admitted to determine what kind of agreement the parties intended to enter into, in light of the ambiguities in the Ground Lease.

## C. *The Ground Lease Is a Joint Venture Agreement and Not a Lease*

█ Under the laws of Pennsylvania (and very likely those of many other jurisdictions), certain factors are necessary to create a joint venture. In *McRoberts v. Phelps,* 391 Pa. 591, 138 A.2d 439 (1958), Pennsylvania's highest court defined a joint venture as follows:

> To constitute a joint venture certain factors are essential: (1) each party to the venture must make a contribution, not necesarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise; (4) usually there is a single business transaction rather than a general and continuous transaction.

*Id.*, 391 Pa. at 599, 138 A.2d at 443–44. Continuing, the *McRoberts* court stated:

> The existence or non-existence of a joint venture depends on the facts and circumstances of each particular case and no fixed nor fast rule can be promulgated to apply generally to all situations. A joint venture ... is an association of parties ... to engage in a single business enterprise *for profit.*

*Id.*, 391 Pa. at 600, 138 A.2d at 444. (emphasis added). Applying these four factors to the provisions of the Ground Lease, as interpreted in light of the parties' intentions and the surrounding circumstances, reveals that the parties did, in fact, intend to enter into a joint venture agreement.

Liona and PCH concede that both parties made a contribution to the venture, the first characteristic enunciated in *McRoberts.* Liona contributed $5,000,000 and PCH contributed $4,000,000 as well as the services of Bernstein, who put together the deal and was required to maintain at least a minimal supervisory role in running the Hotel. It is also undisputed that the fourth factor, the limited duration of the parties' relationship was present.

Liona does contest whether profits were shared among the parties. Liona asserts that, as used in *McRoberts* and cases following it, sharing of profits means sharing in net profits after deducting expenses. Liona claims that it shares only a percentage of increases in gross revenues of the Hotel and not net profits. PCH believes that the fact that Liona will share net profits equally after Liona's investment is repaid, satisfies the requirement of profit sharing.

No authority has been found to support the distinction between gross and net profits that Liona urges upon this court. In *Marcus v. Grant,* 289 Pa. 1, 3, 137 A. 120, 121 (1927), the court refers to the profit to which one party was entitled as net profit, but the agreement itself was silent, and the court failed to explain how it arrived at this definition of profit. In *Waldman v. Shoemaker,* 367 Pa. at 590, 80 A.2d at 777–78, the agreement entered into by the parties specified that "net profits" would be

shared; however, the court found that the other elements of a joint venture were missing. In *Wilkins v. Heebner,* 331 Pa. Super. at 491, 480 A.2d at 1145 (1984), one party's share of the profits was "a ten percent interest in the commercial enterprise" being formed. This equity share was recognized to be a form of compensation; neither the agreement nor the court mentioned whether the ten percent would come out of gross or net profits. The only language that was unearthed to support either PCH's or Liona's definitions of "profit" is found in 48A Corpus Juris Secundum § 13 at 419, where it is stated:

> So, the fact that there is to be unequal distribution of profits does not contravene the idea of joint venture, *and the parties* to the joint venture *may* limit by special contract their respective profits and *agree which part of the expense each should bear before participating in profits.*

*Id.* (footnotes omitted; emphasis added).

Whether the parties intended to share gross or net profits is immaterial to support a finding that they entered into a joint venture. They agreed that Liona would share in the cash flow of the Hotel, *see* Ground Lease § 3.02; 5/15/85 Tr. at 350, and then further agreed to the expenses for which PCH would have responsibility. *See* Ground Lease § 2.01(a); 5/15/85 Tr. at 345–48. The sharing of profits element has been demonstrated.

Liona's contention that there exists neither joint proprietary interest nor the right of mutual control over the subject matter of the agreement is similarly unpersuasive. Caselaw indicates that the degree of mutual participation necessary to satisfy the joint venture test is somewhat flexible. Pennsylvania law requires "some active participation in the enterprise." *Waldman v. Shoemaker,* 367 Pa. at 592, 80 A.2d at 778.

It has previously been noted that PCH concedes that neither party ever intended Liona to have responsibility for daily Hotel management. *See* Deposition of Fausto Rusca, Fidinam Employee, at 28–29, 44–45,

65. Nevertheless, it is apparent that Liona retained an active proprietary interest in and control over the Hotel venture. For example:

1) Section 3.03 of the Ground Lease required PCH to keep the Hotel books according to a prescribed system and to give Liona access to these financial records. In addition, PCH was required to provide Liona with quarterly reports and an annual audit report;

2) Section 7.02 of the Ground Lease requires the parties to cooperate in connection with the collection of any insurance moneys, and illustrates Liona's proprietary interest by providing that Liona would share in any adjustments above $250,000;

3) Article 9 and § 14.02 of the Ground Lease provide that if Hotel restoration costs or capital improvement costs exceed $500,000, Liona has reasonable veto power over PCH's choice of any architect or engineer, or general contractor;

4) Section 11.01 of the Ground Lease requires Liona's consent before the ownership of PCH may change, gives Liona a right of first refusal to purchase PCH's interest, and requires that any transfer of PCH's interest be a complete one, *i.e.*, PCH must transfer its interest in the Hotel together with its interest in the lease;

5) Section 22.01 of the Ground Lease permits Liona to enter the Hotel or the land and to perform any act PCH should have but failed to perform;

6) Article 40 of the Ground Lease permits Liona to perform any mortgagee's obligation if PCH fails to do so.

In *Wilkins v. Heebner*, 331 Pa.Super. at 498, 480 A.2d at 1145, the court found that where one party "conferred upon [the other] no decision making power and no power to accept or reject the terms and conditions of the lease," there was "not one iota of evidence that [they] shared a joint proprietary interest in or right of control over" the venture. *Id. See also Beavers v. West Penn Power Co.*, 436 F.2d 869, 873 (3d Cir.1971) (permission to use utility's poles to string wire, where ownership and exclu-

sive obligation to maintain poles remained in owner, insufficient to support finding of joint proprietary interest as required by Pennsylvania joint venture law); *McRoberts v. Phelps*, 391 Pa. 591, 138 A.2d 439 (listing indicia supporting finding of joint venture); *Waldman v. Shoemaker*, 367 Pa. at 591–92, 80 A.2d at 776 (same). This court finds that the proprietary interest Liona retained under the Ground Lease, as detailed above, coupled with its right to exercise active control under the delineated circumstances satisfy the requirements of Pennsylvania law. PCH has demonstrated that Liona has sufficient control pursuant to the terms of the Ground Lease to satisfy that this element of a joint venture is also presented here.

The parties' intentions and the circumstances surrounding the parties' agreement to enter into the Hotel venture have already been reiterated. This court has previously recognized that a joint venture is an amorphous concept that may adopt a variety of guises. In *In re York Furniture Company*, 32 B.R. 211 (Bankr.S.D.N.Y.1983), it was stated:

> Most courts agree that it is easier to define a joint venture than to recognize one. In *U.S. v. Standard Oil Co. of California*, 155 F.Supp. 121 (S.D.N.Y.1959), the court noted that a finding of joint venture depended on the facts of the case " 'and owing to the multifariousness of facts, no case of coadventure rises higher than a persuasive precedent for another.' " *Id.* at 148 (quoting *Harris v. Morse*, 54 F.2d 109, 113 (S.D.N.Y.1931) ).

*Id.* at 214.

Suffice it to say that this court is persuaded by the terms of the Sale-Leaseback Agreement, the Ground Lease, the testimony adduced at trial, and the other evidence presented that the parties intended to enter into and did successfully construct a joint venture agreement. Therefore, the lease is not an unexpired lease of nonresidential property within the scope of §§ 365(d)(3) and (4). For other purposes this determination leaves the parties in a venture rela-

tionship governed in accordance with their agreements subject to the unfolding reorganization.

Because the debtor has entered into a conditional restructuring of PCH with a third party [3] which provides *inter alia* for infusion of $22 million, the issues raised by Liona under § 363 are presently mooted.

It is SO ORDERED.

---

**3.** An Order approving agreement by and among the Debtor, the Present General and Limited Partners of the Debtor and Michael Grasso, Individually and on Behalf of a Group of Individuals and Entities was entered on March 12, 1985 after notice and hearing. The restructuring contemplates satisfaction of the claims of all essential parties in interest.