**In re Marion J. PERRET and Annette Perret, d/b/a Hill Haven Farm, Debtors.**

**J. Reiley McDONALD, Trustee, Plaintiff,**

v.

**Mohammed Taieb DABBAGH and Charles W. Schoeneman, Defendants.**

**Bankruptcy No. 82–10055.**

**85 Adv. 8007.**

United States Bankruptcy Court, N.D. New York.

Dec. 2, 1986.

---

Carter, Ledyard & Milburn, New York City, for trustee. James W. Rayhill, and Marta S. Lively, of counsel.

Charles W. Schoeneman, Washington, D.C., pro se.

## DECISION ON COMPLAINT SEEKING AN ORDER FOR A SHORTFALL CLAIMED DUE UNDER CONFIRMED PLAN

HOWARD SCHWARTZBERG, Bankruptcy Judge, by designation.

The issues in this adversary proceeding arose out of a confirmed Chapter 11 liquidating plan of reorganization which gave the trustee the option, in lieu of a cash payment at distribution, to deliver immediately thoroughbred horses from this estate to a Saudi Arabian resident holding an allowed claim of $500,000. The delivery of the horses was subject to an express condition that in the event of a shortfall in the proposed distribution to the unsecured claimholders, the Saudi was required to return sufficient horses or cash to cover his *pro rata* shortfall liability. The actions of the Saudi and his local attorney, (who was also chairman of a two person creditors' committee), in their dealings with the Chapter 11 trustee and this estate with respect

to the delivery of thoroughbred horses, gave rise to this adversary proceeding commenced by the Chapter 11 trustee. The trustee claims that there is a shortfall in available cash for distribution to unsecured creditors and that the Saudi, Mohammed Taieb Dabbagh, and his attorney, Charles W. Schoeneman, are each personally obligated to the estate for the $365,000. Bloodstock Appraisal value of the thoroughbred horses assigned to the Saudi. The complaint also seeks to recover $33,500 for stallion seasons, or stud fees, incurred to service four of the assigned mares.

The attorney, Charles W. Schoeneman, has counterclaimed against the estate for damages allegedly sustained as a result of the trustee's refusal to turn over jockey Club certificates and other registration papers and his alleged failure to allow Schoeneman complete control in the resale of the horses. The counterclaim also seeks to have the trustee removed and directed to pay damages to the estate and to Schoeneman because of the trustee's conduct with respect to the sale of the horses at an auction conducted by Fasig-Tipton Company, Inc., the trustee's employer, which allegedly caused damage to the estate and to Dabbagh. The defendant, Mohammed Taieb Dabbagh, filed an answer in the form of a letter, but did not appear at the trial. The defendant, Charles W. Schoeneman, appeared *pro se.*

## FINDINGS OF FACT

1. The debtors, Marion J. Perret and his wife, Annette Perret, filed a voluntary joint Chapter 11 petition with the United States Bankruptcy Court for the Northern District of New York on January 8, 1982. They were originally continued in possession of the property of their estates pursuant to 11 U.S.C. § 1108.

2. After notice and hearing following a request made by the creditors' committee, plaintiff was appointed and serves as the Chapter 11 trustee of the debtors' estates pursuant to orders of the United States Bankruptcy Court for the Northern District of New York, dated February 25, 1983 and March 7, 1983.

3. Defendant, Mohammed Taieb Dabbagh, is a subject of the Kingdom of Saudi Arabia with his principal place of business located at Dabbagh Establishment, Madinah Road, Jeddah, Kingdom of Saudi Arabia. Dabbagh is the Class Six Creditor under the trustee's Second Amended Chapter 11 Plan (the "Plan") which was confirmed by the United States Bankruptcy Court for the Northern District of New York, by order dated March 7, 1984.

4. Defendant, Charles W. Schoeneman, is an attorney and a resident of Washington, D.C. with an office located at 2501 M Street N.W., Suite 604, Washington, D.C. Schoeneman was chairman of the official creditors' committee, which consisted of two persons. He also represented Mohammed Taieb Dabbagh in this case as Dabbagh's attorney in fact pursuant to a power of attorney dated March 27, 1982. Exhibit 2. Mr. Schoeneman had previously represented Dabbagh under an earlier power of attorney in enforcing an international arbitration award against the debtor, Marion J. Perret, which was then filed as a claim against this estate in the amount of $3,073,091. Schoeneman also represented Dabbagh in this case as the latter's attorney at law, until he resigned in February of 1985.

5. The debtors had been engaged in the business of breeding, raising and selling thoroughbred race horses. They operated a thoroughbred horse farm consisting of approximately 270 acres located in Columbia County, New York, known as "Hill Haven Farm". The debtors resided in Metairie, Louisiana, where they owned a home. They also owned a parcel of vacant land in Lacombe Harbor, Louisiana.

6. The Chapter 11 trustee, J. Reiley McDonald, is a vice president of Fasig-Tipton Company, Inc., a firm recognized in horse breeding circles as a leading auctioneer of thoroughbred racing horses. McDonald was recommended to the creditors by Schoeneman as a knowledgeable person

who is familiar with the business of breeding and selling thoroughbred race horses. Upon the consent of counsel for the creditors' committee and at the suggestion of the creditors' committee, McDonald was appointed by the court as Chapter 11 trustee, effective March 11, 1983.

7. After meeting with the creditors and the debtors, the Chapter 11 trustee filed with the court on October 4, 1983 a plan of liquidation which proposed to sell substantially all of the debtors' assets. The proposed plan was amended several times, the last being December 30, 1983. Following the court's approval of a disclosure statement, the proposed plan was consented to by the debtors who hoped to salvage some assets, if possible. The plan was also appropriately accepted by the requisite majority of creditors as required under 11 U.S.C. § 1126(c) and was ultimately confirmed pursuant to an order of the court dated March 7, 1984.

8. The plan divides the secured and unsecured claims, exclusive of priority and administration expense claims, into seven classes. The general unsecured claims were placed in Class 7 and were offered a potential 100% distribution to the extent of the availability of funds for repayment. During the negotiations with respect to the plan, Dabbagh's $3,073,091 claim, which represented the largest unsecured claim against the estate, was reduced to $500,-000, with Dabbagh's consent. Dabbagh's unsecured claim was given special treatment under the Plan and was placed in a separate class, referred to as Class 6.

9. As the Class 6 unsecured claimholder, Dabbagh was entitled to receive $500,-000 in cash to the extent that funds were available at the time of distribution, or, the trustee could elect to deliver horses to Dabbagh prior to the time when Classes 1 through 3 received their minimum distributions. In the event that the trustee elected to deliver horses to Dabbagh, certain conditions were imposed. Among the conditions were that the trustee would retain a lien on the horses for the benefit of the estate. Another condition attached to the delivery

of the horses, and which forms the basis for the instant adversary proceeding, was that Dabbagh and the Class 7 creditors would share ratably in any shortfall in the funds available to satisfy their claims. The Plan provided that, in the event of such shortfall, Dabbagh would be obligated to reconvey horses or pay cash to cover the amount necessary so that Dabbagh and the unsecured Class 7 claims shared the shortfall ratably. In other words, Dabbagh was not to receive an advantage or preference over the other unsecured creditors and his *pro rata* share was not to exceed the *pro rata* shares received by the other unsecured creditors merely because Dabbagh received horses in kind before the unsecured creditors received their distributions. To the extent that the other unsecured creditors received less than 100% of their claims, Dabbagh was obligated to return sufficient horses or cash to maintain the *pro rata* level of distribution to all the unsecured creditors. This provision was expressed in paragraph 4 of Article 5.06 of the Plan as follows:

To implement this provision Dabbagh and the Trustee shall agree that if the proceeds of sale generated or reasonably expected to be generated from the sale of the Property of the Estate are insufficient, so that a shortfall is extant or reasonably likely to exist, the Trustee shall have the right to require and Dabbagh shall have the obligation to reconvey to the Trustee for liquidation either (i) such of the mares as shall have a sales value, as determined pursuant to the Bloodstock Appraisal, sufficient to provide for the allocation of the shortfall or, (ii) at the election of Dabbagh cash in an amount equivalent to the appraised value of the mare(s) as specified in the Bloodstock Appraisal, whereupon Dabbagh and the unsecured creditors shall receive the proceeds of sale pro rata and shall share in the shortfall ratably. (for this purpose the Claim of Dabbagh shall be valued at $500,000.)

10. The trustee incorrectly states the crucial terms of the Plan in paragraph 7 of the complaint as, follows:

The Plan *gave the Class Six Creditor the option to elect* to receive either cash or these horses in satisfaction of his claim. *If the Class Six Creditor elected* to keep the Horses, however, the Plan provided that he would be obligated to pay the Trustee an amount in cash sufficient to make up any shortfall in the funds available to satisfy claims under the Plan.

(Emphasis added). On the contrary, Article 5.06 of the Plan provides:

In lieu of a cash payment, Dabbagh may receive, *at the option of the Trustee*, the mares....

\* \* \* \* \* \*

In the event that the *Trustee elects* to delivery the enumerated mares to Dabbagh, the following conditions shall be imposed on the transfer....

(Emphasis added). Thus, the trustee's transfer of the horses to Dabbagh in accordance with the terms of the Plan was made at the trustee's option and election, and not because Dabbagh may have elected to take horses immediately instead of receiving cash, if any, at the prescribed time for distribution to unsecured claims.

11. Indeed, Dabbagh did not want to take horses in kind and specifically informed Schoeneman, his attorney in fact and at law, to this effect when he sent Schoeneman a Telex dated January 29, 1984, which read in part as follows:

HEREBY I WOULDLIKE [sic] TO INFORM YOU OFFICIALLY THAT I CANNOT ACCEPT THE CONDITIONS FOR TRANSFER OF MARES AND INSTEAD RATHER RECEIVE ONLY CASH. PLEASE TAKE NECESSARY ACTIONS TO SEE THAT I WILL NOT BE RESPONSIBLEFOR [sic] ANY MARES.

Exhibit 11.

12. Schoeneman replied to Dabbagh by Telex which was received on February 16, 1984 as follows:

THIS IS TO CONFIRM THAT THE UNDERSIGNED (1) WILL SEE THAT YOU HAVE NO PERSONAL RESPONSABILITY [sic] OR LIABILITY FOR CARING FOR OR INSURING THE HORSES AND (2) IS MAKING EVERY EFFORT TO SELL YOUR INTEREST IN THE HORSES AS SOON AS POSSIBLE AFTER THEY ARE IN OUR POSSESSION. I HAVE BEEN ASSURED THAT SALE OF THE HORSES WILL BE PERMITTED SO LONG AS.THE ESTATE'S INTEREST IS PROTECTED, IF THAT APPROACH IS NECESSARY.

Exhibit 12.

13. Schoeneman had a personal interest in maximizing Dabbagh's recovery. When Schoeneman was originally retained by Dabbagh with respect to the international arbitration proceeding which forms the basis for Dabbagh's claim against this estate, Schoeneman's agreed compensation was on a contingency basis, calculated at the rate of 25% of any recovery by Dabbagh. Thus, Schoeneman was a 25% coventurer with Dabbagh after any distribution from the estate. He was therefore anxious to get his hands on some assets of the estate as soon as possible rather than wait for a distribution to unsecured creditors to the extent of any available cash after the estate was liquidated by the trustee. Thus, despite Dabbagh's reluctance to accept horses in lieu of a cash distribution, Schoeneman preferred to have horses delivered to him immediately for Dabbagh's account which he hoped to sell as soon as possible and realize a cash return for Dabbagh and himself.

14. Horses *per se* are a wasting asset, in that substantial expenses must be incurred in order to insure, feed, breed, maintain and care for them. Neither Dabbagh nor Schoeneman were financially capable of maintaining the horses proposed to be delivered in accordance with Article 5.06 of the Plan. On the other hand the Chapter 11 trustee desired "to relieve the estate as soon as possible of the financial burden of caring for the Mares prior to the Consummation Date while preserving the estate's interest in the Mares in the event of a shortfall in the funds available to implement the provisions of the Plan; ...."

Stipulation and order dated July 17, 1984. Exhibit 3.

15. The Chapter 11 trustee, who is a vice president of Fasig-Tipton Company, Inc., introduced Schoeneman to Thoroughbred Equity Company, Incorporated ("TECO"), a subsidiary of Fasig-Tipton and one of the major financial service companies in the horse industry. Schoeneman sought and obtained the consent of the creditors' committee and the Chapter 11 trustee for a $200,000 line of credit from TECO to finance the cost of maintaining and caring for the horses to be delivered pursuant to Article 5.06 of the Plan. Such consent was necessary because in exchange for TECO's advances, TECO was to receive a first lien on the horses. No funds were to be advanced by TECO without the express authorization of the Chapter 11 trustee. Additionally, Dabbagh was to be liable to TECO for an up front service fee of $10,000 that would not be covered by the lien on the horses. This agreement was incorporated in a stipulation dated July 17, 1984 which was signed by Schoeneman as attorney in fact for Dabbagh and by James Rayhill of Carter, Ledyard & Millburn, as attorneys for the Chapter 11 trustee. The stipulation was consented to by Andrew DeNatale of Stroock & Stroock & Lavan and was "so ordered" by Bankruptcy Judge Jeremiah Berk on July 30, 1984. Exhibit 3.

16. Although Dabbagh specifically informed Schoeneman, his attorney in fact and his counsel, that he rejected the concept of receiving mares in kind and preferred to receive only cash, Schoeneman proceeded to negotiate a court-approved stipulation, dated July 17, 1984, which authorized Dabbagh to borrow $200,000 from TECO for the expenses of the care, breeding and maintenance of mares to be delivered by the trustee to Dabbagh. Additionally, Schoeneman agreed on behalf of Dabbagh that Dabbagh would be personally liable to TECO for a $10,000 "up front service fee" which "expenses are solely the obligation of Dabbagh and do not constitute claims against this estate or the assets thereof...." Stipulation dated July 17, 1984. This conduct by Schoeneman, as attorney in fact and counsel for Dabbagh, was totally inconsistent with Schoeneman's representation to Dabbagh that Schoeneman "will see that you have no personal responsability [sic] liability for caring for or insuring the horses...." Exhibit 12.

17. The Chapter 11 trustee was not privy to the correspondence between Dabbagh and Schoeneman and was unaware of Dabbagh's reluctance to accept horses in kind or to assume any personal responsibility for the expenses of caring for and maintaining the horses. The Chapter 11 trustee and the court relied upon Schoeneman's apparent authority to act for Dabbagh because Dabbagh had previously empowered Schoeneman to act as Dabbagh's attorney in fact as well as his counsel in this case. Exhibit 9. The Chapter 11 trustee had no intention to deal with Schoeneman individually or in any capacity other than as attorney in fact and at law for Dabbagh.

18. After the stipulation dated July 17, 1984 was approved, Schoeneman applied to TECO for a loan to cover the expenses of the care, breeding and maintenance of the horses referred to in Article 5.06 of the Plan. Schoeneman dealt with the Chapter 11 trustee and TECO by means of a company which he formed, known as World Wide Thoroughbreds. Despite the fact that the July 17, 1984 stipulation was signed by Schoeneman in Dabbagh's name, the TECO loan note, dated August 1, 1984, was signed by Schoeneman in his own name, as well as by him as attorney in fact for Dabbagh "d/b/a Worldwide Thoroughbreds". Exhibit 14. Indeed, Schoeneman also submitted his own personal financial statement in support of the loan. Exhibit 18.

19. Pursuant to a security agreement dated June 9, 1984, TECO was given a security interest in all of the horses referred to in Article 5.06 of the Plan thereof, whether *in utero* or subsequently conceived. Exhibit 20. The security agreement was signed by Charles W. Schoeneman, personally and by Charles W.

Schoeneman as attorney in fact for Dabbagh also "d/b/a Worldwide Thoroughbreds."

20. By check dated September 14, 1984, TECO advanced to Charles W. Schoeneman, d/b/a Worldwide Thoroughbreds, the sum of $110,000. Exhibit 21. Schoeneman deposited this check in an account which was opened with the European American Bank in the name of Charles W. Schoeneman, d/b/a Worldwide Thoroughbreds. There were three deposits made to this account as follows: May, 1984, $60,000; September, 1984, $110,000, and November, 1984, $30,000, for a total of $200,000. This account also reflects withdrawals made by Schoeneman for his own account either as expenses or advances in the total amount of $12,792. The account served as the source for the payment of the expenses incurred for the care and maintenance of the horses referred to in Article 5.06 of the Plan.

21. In September of 1984, Schoeneman and the Chapter 11 trustee sought to enter two of the mares described in Article 5.06 of the Plan in an auction sale known as the Keenland Auction. It was a five-day sale and the two mares were not scheduled to be sold until the last day of the sale. The Chapter 11 trustee advised Schoeneman that this was not a good time to sell the mares because the best horses were always sold early and the market deteriorates after the first two days. The Chapter 11 trustee had an interest in maximizing the prices received for the horses because the estate retained a lien on the horses for the benefit of the estate. Schoeneman and the Chapter 11 trustee agreed to withdraw the two mares from the Keenland Auction and to put them up for auction, along with all the other horses referred to in Article 5.06 of the Plan, at the Fasig-Tipton Kentucky Mixed Sale in early November of 1984.

22. Schoeneman did not have unfettered control of the horses because the estate retained a lien on the horses in accordance with the terms of Article 5.06 of the Plan to the extent of any liability by Dabbagh for any shortfall in distributions as provided under the Plan. Additionally, in accordance with the court-approved stipulation dated July 17, 1984, TECO was granted a first security interest in the horses to the extent of loans which it made for their care and maintenance. Hence, TECO retained possession of the jockey club registration certificates for the horses, which prevented Schoeneman from selling the horses to any other potential buyer without the consent of TECO or the Chapter 11 trustee.

23. Schoeneman did not act unilaterally with regard to the horses and kept Dabbagh apprised of his conduct. In fact Schoeneman also conferred with a local individual known as Judge McMahan, who also represented Dabbagh's interests in this country. In an undated Telex, Schoeneman apprised Dabbagh as follows:

TAIEB:

AS SCHEDULED, THE DATE APPROACHES WHEN THE PERRET ESTATE CHAPTER 11 PLAN MUST BE CONSUMMATED BY THE TRUSTEE (NOVEMBER 30, 1984). THIS TELEX WILL BRING YOU UP TO DATE AS TO THE STATUS OF THE MATTER.

1. THE HORSES (9 BROODMARES AND NOW 4 FOALS) DELIVERED TO YOU CONDITIONALLY ARE WELL AFTER A BRIEF SCARE WITH A SERIOUS VIRUS (VIRAL ARTERITIS) WHICH SWEPT THROUGH THE HORSE FARMS IN THE STATE OF KENTUCKY WHERE ALL OF THE MARES WERE KEPT.

2. AFTER CONSULTING WITH JUDGE MCMAHAN I HAVE OBTAINED FINANCING TO SEE THAT THEY ARE PROPERLY FED AND CARED FOR THROUGH NOVEMBER 30, 1984 OR SUCH EARLIER DATE AS THEY MAY BE SOLD. I HAVE ALSO SEEN TO THEIR BREEDING THIS YEAR TO ENHANCE THEIR VALUE. ALL NINE BROODMARES ARE NOW IN FOAL. AFTER CONSULTING WITH JUDGE MCMAHAN I HAVE ALSO ARRANGED FINANCING FOR THE STALLION STUD FEES ON A

LIVE FOAL BASIS TO ACCOMPLISH THIS.

3. THE TRUSTEE INDICATES THE PERRET BANKRUPTCY ESTATE APPEARS TO BE IN SOME DIFFICULTY IN TERMS OF MEETING ITS OBLIGATIONS TO THE OTHER UNSECURED CREDITORS. HENCE A 'SHORTFALL' OF SOME UNDETERMINED SIZE IS PROBABLE. AS YOUR CLAIM IS VALUED AT APPROXIMATELY 5/7'S OF THE ENTIRE UNSECURED DEBT, I WILL BE REQUIRED TO PAY A SUM EQUAL TO APPROXIMATELY 5/7'S (OR 72 PERCENT) OF ANY SUCH SHORTFALL. WE ARE NEGOTIATING ALL ASPECTS OF THE SITUATION TO KEEP THE AMOUNT OF ANY SUCH PAYMENT TO A MINIMUM OF COURSE. WE WILL NOT KNOW THE EXACT AMOUNT UNTIL NOVEMBER.

4. ALL OF THE BROODMARES WILL BE ENTERED OR SOLD PRIVATELY IN NOVEMBER HORSE SALES IN KENTUCKY IN ORDER TO MAKE LIQUIDITY SUFFICIENT TO PAY ANY SHORTFALL AND TO PAY YOU YOUR SHARE OF THE CLAIM AS SOON AS POSSIBLE.

I AM ALSO AS IS J. MCMAHAN VERY ACTIVELY ATTEMPTING TO SELL THE BROODMARES PRIVATELY. IT IS MY AND JUDGE MCMAHAN'S CONTINUED UNDERSTANDING THAT YOU WISH PAYMENT IN MONEY AND HAVE AGREED TO ACCEPT THE SUM OF 375,000 IN CASH AS SOON AS POSSIBLE IN SATISFACTION OF THE ¾ PORTION OF YOUR AWARDED CLAIM IF IT IS 500,000 USD IF AND WHEN I CAN LIQUIDATE SUFFICIENT HORSES TO PAY THAT SUM OR WHATEVER IT TURNS OUT TO BE AFTER ANY SHORTFALL IS SUBTRACTED.

I WOULD LIKE CONFIRMATION OF THIS LETTER OR TELEX AND WELCOME OF COURSE ANY QUESTIONS OR COMMENTS.

BEST REGARDS,

SINCERELY CHARLIE

Exhibit 25.

24. Dabbagh responded to Schoeneman by Telex dated August 12, 1984 as follows:

CHARLIE:

REFERENCE TELEX 10TH. AUGUST, 84. TOLD YOU IN MARCH 1984 IN PRESENCE OF JUM G. AND J MCMAHAN WOULD TAKE USD 375,000 THEN FOR MY SHARE BUT NOT IF I HAD TO WAIT UNTIL NOVEMBER 1984. HOWEVER, WILL ACCEPT THIS AMOUNT UP TO 1ST. SEPTEMBER, 1984. THEREAFTER WILL HAVE TO TAKE CHANCES ON SALES. IN NOVEMBER PRESS (RETURN) TO CONTINUE

WILL TAKE MY AMOUNT OF THREE QUARTERS OF TOTAL. OUR UNDERSTANDING ESTATE TO PAY FOR FOOD AND LODGING. WHAT HAPPENED??

BEST REGARDS

M.T. DABBAGH

Exhibit 24.

25. Schoeneman then replied to Dabbagh by Telex dated August 24, 1984 as follows:

TAIEB: REFERENCE YOUR TELEX DATED AUGUST 12.

BECAUSE OF UNCERTAINTIES CONCERNING ABILITY OF TRUSTEE TO FUND PLAN COMPLETELY, IT IS NOT POSSIBLE TO SELL ANY HORSES FOR YOUR ACCOUNT AT PRESENT, AT LEAST UNTIL WE KNOW APPROXIMATELY HOW MUCH THE 'SHORTFALL' TO THE UNSECURED CREDITORS IS, IF ANY. THE TRUSTEE WOULD NOT AGREE TO ANY RELEASE OF SALES PROCEEDS UNTIL ADEQUATE PROVISION FOR THE SHORTFALL IS MADE. A MEETING IS SCHEDULED IN NEW YORKNNEXT [*sic*] WEEK TO ASCERTAIN THE AMOUNT OF THE SHORTFALL EXPECTED AND THE AMOUNT WE WILL HAVE TO PAY BACK. I WILL ATTEMPT TO OBTAIN APPROVAL TO SELL SUFFICIENT HORSES TO PAY YOU BY AGREEING

TO ESCROW ENOUGH FUNDS TO PAY OUR PERCENTAGE OF THE SHORTFALL PROJECTED SO THAT YOU CAN BE PAID IN ADVANCE OF NOVEMBER. ALTHOUGH YOUR REFERENCED DATE OF SEPTEMBER 1 APPEARS SOMEWHAT UNREALISTIC AT THIS TIME, PAYMENT DURING SEPTEMBER MAY NOT BE OUT OF THE QUESTION. I WILL MOVE AS EXPEDITIOUSLY AS BOTH THE TRUSTEE AND THE COURT PERMIT.

SINCERELY,

CHARLIE

Exhibit 27.

26. In a Telex dated September 13, 1984, Schoeneman supplemented the information he furnished to Dabbagh in his August 24th Telex and said:

TAIEB: REFERENCE MY TELEX DATED AUGUST 24

MEETING IN NEW YORK WEEK OF AUG. 27 INCONCLUSIVE AS TO AMOUNT OF SHORTFALL BUT A SUBSTANTIAL SHORTFALL APPEARS LIKELY UNLESS MARKET FOR STALLION SHARES OWNED BY THE ESTATE IMPROVES (SUBSEQUENT TELEPHONE CONVERSATIONS HAVE NOT PRODUCED ANY EXACT AMOUNT). I HAVE REQUESTED MORE PRECISE INFORMATION ABOUT THE STALLION SHARE VALUES PLUS MORE EXACT AMOUNTS OF UNSECURED AND SECURED DEBT REMAINING UNPAID. I HAVE ALSO REQUESTED THAT LAWYERS FOR THE TRUSTEE AND FOR THE CREDITORS COMMITTEE REDUCE THEIR LEGAL FEES. MATTERS ARE OBVIOUSLY IN AN UNSETTLED CONDITION BUT SHOULD CLARIFY THEMSELVES IN NEXT TWO WEEKS.

SINCERELY,

CHARLIE

EXHIBIT 26.

27. Shortly before the sale of the horses on November 9, 1984, Schoeneman informed Dabbagh as follows in a Telex dated November 7, 1984:

DEAR TAIEB:

ALL OUR HORSES WILL BE AUCTIONED FRIDAY NIGHT NOVEMBER 9. ONE MARE AND HER FOAL COULD BE HELD BACK BECAUSE OF VIRUS. SHORTFALL AMOUNT STILL NOT DEFINITE. TRUSTEE SAYS IT COULD BE AS HIGH AS DLR 250,000 BUT I DOUBT IT. HOUSE AND LOT PLUS 6 STALLION SHARES STILL REMAIN IN ESTATE AND SHARES WILL SELL WELL. ESTATE NOW MAY STAY OPEN TILL FEBRUARY. I WILL CALL YOU NEXT WEEK WITH UPDATED INFORMATION REGARDING SALE. JUDGE MCMAHON SAID HE PLANS TO ATTEND. NOTE NEW TELEX NUMBER.

REGARDS,

CHARLIE

Exhibit 28.

28. On September 13, 1984, two months prior to the sale of the horses on November 9, 1984, the Chapter 11 trustee sent a letter to Schoeneman notifying him of a shortfall under the Plan as follows:

Pursuant to Section 5.06 of the Trustee's Second Amended Chapter 11 Plan of Reorganization, I hereby notify you as Agent for Mohammed' Tied [*sic*] Dabbagh, the Class 6 creditor, that there is a shortfall in the funds available to satisfy all of the claims under the aforementioned Plan. Please hereby be advised that the existence of this shortfall gives rise to certain obligations on behalf of your client as outlined in the Plan.

Exhibit 4.

29. Schoeneman replied to the Chapter 11 trustee in a letter dated October 22, 1984 as follows:

J. Reiley MacDonald

c/o Carter, Ledyard & Milburn

2 Wall Street—115th Fl.

New York, New York 10005

Dear Mr. MacDonald:

This is to confirm my advice to you that pursuant to Section 5.06 of the

Trustee's Second Amended Chapter 11 Plan, Dabbagh elects to pay to the Trustee cash in an amount sufficient to provide for the allocation of any shortfall. It is understood that this cash will be in an amount necessary to allocate the shortfall, if any, ratably between Dabbagh and the Class 7 creditors.

> Sincerely,
> s/ Charles W. Schoeneman
> Charles W. Schoeneman, Esq.,
> as Counsel to Mohammad Taieb
> Dabbagh

Exhibit 5.

30. The Bloodstock Appraisal value of the nine mares assigned to Dabbagh, as specified in the appraisal report of the Bloodstock Research Agency, Inc., dated March 20, 1983 amounted to $365,000, based upon the following figures:

| | |
|---|---|
| By Popular Demand, 1970 | $ 45,000 |
| In foal Monteverdi 5/24 | |
| Damascat, 1978 | 100,000 |
| In foal Green Dancer 7/13 | |
| Mist of Ayre, 1973 | 25,000 |
| In foal Laomedante 3/29 | |
| Over Guarantee, 1971 | 20,000 |
| In foal Ruthie's Native 6/25 | |
| Royal Interest, 1975 | 20,000 |
| Barren | |
| Tribal Envoy, 1969 | 40,000 |
| In foal Monteverdi 7/5 | |
| Turn N' Charm, 1976 | 30,000 |
| In foal Dance Bid 6/6 | |
| Twenty Eight Gems, 1976 | 50,000 |
| In foal Gregorian 4/27 | |
| What A Trinket, 1972 | 35,000 |
| Barren | |
| Total | $365,000 |

Exhibit 36.

31. The horses referred to in Article 5.06 of the Plan were sold at the Fasig-Tipton Kentucky, Inc. mixed sales on November 9, 1984. The gross proceeds from the sale of the horses assigned to Dabbagh amounted to $242,200. Exhibits 30 and 31. Schoeneman signed a power of attorney, individually and as attorney in fact for Dabbagh, appointing TECO as attorney in fact to collect the proceeds of sale of any horses sold at the auction and authorizing any purchaser of the horses to pay the proceeds of sale solely to TECO Exhibit 32. After deducting all the charges due to TECO in connection with the financing to pay for the care, feeding and breeding of the horses, and after subtracting the commissions owed for the auction sales, there were no proceeds remaining for payment to either Dabbagh or to the Chapter 11 trustee towards his retained lien.

32. Schoeneman informed Dabbagh in Saudi, Arabia of the unpleasant auction results in a Telex which was received on December 5, 1984 Schoeneman further said:

> IT IS HOWEVER MY JUDGMENT WITH WHICH EVERYONE SEEMS TO CONCUR THAT WE WILL UNFORTUNATELY PRODUCE NO BETTER THAN A BREAKEVEN RESULT WHEN ALL BILLS ARE PAID.

Exhibit 22.

33. Unfortunately for Dabbagh, the situation was worse than mere breakeven. After the horses had been assigned to Dabbagh, Schoeneman had entered into an oral agreement with the Chapter 11 trustee whereby Schoeneman purchased four "stallion seasons" from the estate. A stallion season is the exclusive right to breed a specific stallion with mares owned by the purchaser. The amount for this purchase is fixed and due whether or not the mares conceive or produce foals. The total purchase price was $33,500, due October 1, 1984, with interest at the rate of 1½% per month thereafter. The Chapter 11 trustee testified without contradiction that this interest rate is the standard rate for the late payment of stallion shares for thoroughbred horses. Schoeneman testified that his purchase of the four stallion seasons from the estate was a good idea because it meant breeding mares that were delivered by the estate to the estate's own seasons. Schoeneman further testified that this transaction with the Chapter 11 trustee was conducted by him as attorney in fact for Dabbagh in accordance with his representation of Dabbagh's interests in this case.

34. Although the Chapter 11 trustee's sale of four stallion seasons to Schoeneman, as attorney for Dabbagh, grew out of the assignment of horses in kind to Da-

bbagh, it nevertheless meant that the Chapter 11 trustee had engaged in a credit transaction with a creditor of this estate. In view of the fact that the estate has not been paid the $33,500 purchase price, it follows that the estate has lost an additional $33,500 in assets.

35. In an undated document entitled "Statement of Application of Proceeds From November 9, 1984 Sale" which was prepared by counsel for the creditors' committee and signed by Schoeneman, as counsel to Dabbagh, it was agreed that the proceeds from the November 9th auction sale would apply in a specific order. First, in payment of all proper charges due and owing to TECO by Dabbagh in connection with the financing to pay for the care, feeding and breeding of the horses. Second, the auctioneer's commissions. Third, the amount necessary to cover the shortfall liability under the Plan. Exhibit 6.

36. The "Statement of Application of Proceeds From November 9, 1984 Sale" which Schoeneman signed, reflects the fact that the Chapter 11 trustee and he contemplated that the shortfall required to satisfy all unsecured creditors in full would be less than the $365,000 Bloodstock Appraisal value of the horses and that Dabbagh's maximum liability under the cash alternative option in Article 5.06 of the Plan would be the $365,000 Bloodstock Appraisal value of the horses assigned to Dabbagh. Thus, if the shortfall necessary to pay all unsecured creditors in full was less than $365,000, Dabbagh was required under the cash option expressed in the Plan to pay the lesser sum to the estate, and it would be subtracted from the $365,000 Bloodstock Value that Dabbagh was treated as having received in advance. Thereafter, the proceeds from the sale of the horses would be distributed *pro rata* to all unsecured creditors, so that Dabbagh would receive a percentage of the proceeds of sale based upon the percentage that his claim bore to the total allowed unsecured claims in Classes 6 and 7. Exhibit 6.

37. The "Statement of Application of Proceeds From November 9, 1984 Sale" explains the sequence of events with respect to Dabbagh's shortfall payment requirement and the subsequent *pro rata* distribution of the proceeds from the sale of the assigned horses as follows:

> For the purposes of applying the formula set forth in the attachment in the event that an administrative shortfall should materialize, it is understood that the administrative shortfall would be subtracted from the sum of $365,000 (the value of the horses delivered to Dabbagh as set forth in the Blood Stock Appraisal), and the balance of the $365,000 will be allocated in accordance with the attachment.

Exhibit 6. The formula in the attachment to Exhibit 6 for allocating the distribution between Dabbagh and the unsecured creditors (on the assumption that there will be proceeds available for distribution) is explained as follows:

> In order to develop a formula for determining how the short-fall shall be allocated, the denominator should be the sum of the Dabbagh claim plus the Class 7 claims. For illustration, assume that the total general unsecured claims are $200,000. Therefore, the denominator should be $200,000.00 (representing Class 7 claims) and $500,000 (representing the Dabbagh claim) for a total sum of $700,000.

The numerator of the fraction was stated to be the $365,000 Bloodstock Appraisal value. By accepting horses valued at $365,000 in lieu of a potential maximum $500,000 distribution to which he is entitled under the Plan, ... "Dabbagh has voluntarily reduced his claim to the value of the Bloodstock Appraisal...." Exhibit 6.

38. The cash option approach which Schoeneman elected on Dabbagh's behalf assumed that the shortfall necessary to pay all unsecured creditors in full would be less than the $365,000 Bloodstock Appraisal value of the horses assigned to Dabbagh. This approach also assumed that after the payment of TECO's lien and the expenses of the sale, there would be sales proceeds available for a *pro rata* distribution to Dabbagh and the other unsecured

creditors. Both assumptions were incorrect. The estate requires more than $365,000 to pay all unsecured creditors in full, because it now appears that the total allowed unsecured claims against this estate amount to more than $700,000 and there are no funds available to pay them anything. Second, after the November 9, 1984 auction sale of the horses assigned to Dabbagh, there were no available proceeds of sale in excess of TECO's lien and the auction expenses to make any *pro rata* distribution to Dabbagh and the other unsecured creditors.

39. In a report filed with the court on October 24, 1984, the Chapter 11 trustee stated that the estate's assets totalled $1,024,699.63 and its liabilities amounted to $1,123,538, so that there were no funds available to satisfy the claims of unsecured creditors. Exhibit B. Similarly, in a report dated December 19, 1984, the Chapter 11 trustee stated that "there will be insufficient funds to make any distributions to the Class 6 and Class 7 creditors, the unsecured creditor classes." Exhibit C.

40. After having been notified by the Chapter 11 trustee pursuant to a letter dated September 13, 1984 (Exhibit 4) that there was a "shortfall in the funds available to satisfy all of the claims ...", Dabbagh had two alternatives under the Plan: First, he could notify the Chapter 11 trustee that he chose to return the horses which the Chapter 11 trustee elected to assign to him. In such case, Dabbagh would have had no further liability to the estate. Second, he could keep the horses and elect to pay to the Chapter 11 trustee "cash in an amount equivalent to the appraised value of the mare(s) as specified in the Bloodstock Appraisal ..." (Paragraph 4 of Article 5.06 of the Plan). If Dabbagh elected the cash alternative, the Plan states: "whereupon Dabbagh and the unsecured creditors shall receive the proceeds of sale pro rata and shall share in the shortfall ratably."

41. As Dabbagh's attorney in fact and at law, Schoeneman expressly advised the Chapter 11 trustee that "Dabbagh elects to pay to the Trustee cash in an amount sufficient to provide for the allocation of any shortfall." Exhibit 5. Having elected to keep the horses and pay cash based on the Bloodstock Appraisal value, Dabbagh was obligated to pay to the estate the full sum of $365,000, which represented the Bloodstock Appraisal value of the horses assigned to him (Exhibit 36), whereupon Dabbagh and the unsecured creditors were entitled to receive the proceeds of sale *pro rata* and share in the shortfall ratably. In view of the fact that there were no proceeds realized from the sale of the horses after the payment of TECO's lien and the expenses of the auction, there were no other funds available which Dabbagh and the unsecured creditors could share on a *pro rata* basis. Thus, after being required to return cash equivalent to the $365,000 Bloodstock Appraisal value of the horses assigned to Dabbagh, he and the unsecured creditors in Class 7 would "share in the shortfall ratably" as provided in the Plan.

42. It now appears that the shortfall for distribution purposes will be 100% of the total unsecured claims in Classes 6 and 7. Therefore, neither Dabbagh nor the Class 7 unsecured creditors will receive any distribution on the basis of the present financial condition of this estate. Thus, the *pro rata* distribution within the meaning of Article 5.06 of the Plan will be zero. However, Dabbagh has not satisfied his obligation under Article 5.06 of the Plan to return cash equivalent to the $365,000 Bloodstock Appraisal value of the assigned horses.

43. Schoeneman maintains that he acted only as attorney in fact and at law for Dabbagh and that any shortfall obligation under Article 5.06 of the Plan is solely Dabbagh's. However, the facts establish that Schoeneman's previous 25% contingency fee arrangement with Dabbagh concerning the collection of Dabbagh's $3,073,091 arbitration award prompted him to take actions that were more in his own interest than for Dabbagh. Schoeneman accepted the assignment of the horses despite Dabbagh's instructions against such conduct.

Schoeneman obligated Dabbagh for the TECO loan even though he assured Dabbagh that he "will see that you have no personal responsibility or liability for caring for or insuring the horses ..." Exhibit 12. Schoeneman signed the TECO loan not only as attorney in fact for Dabbagh, but also as a joint venture, consisting of "Charles W. Schoeneman and Mohammed Tajeb [sic] Dabbagh d/b/a Worldwide Thoroughbreds". Exhibit 14. The address for this business was given as 2700 Virginia Ave., N.W., Washington, D.C. 20037. This is the same location as Schoeneman's business address.

44. In Dabbagh's Telex, dated December 16, 1984, Dabbagh refers to "our claim", Schoeneman's 25% interest, Schoeneman's decision to take horses, and "your idea to be in the horse business," and "at your own risk." The text of this revealing Telex reads as follows:

16TH. DECEMBER, 1984

ATTN: CHARLES SCHOENEMAN

WE RECEIVED YOUR TELEX AND IT IS NOT THAT SIMPLE TO ACCEPT THIS TRAGIC END RESULT OF OUR CASE. I HAVE BEEN TELLING YOU FROM THE VERY BEGINNING THAT THE IDEA OF HORSES IS A BIG RISK AND WE SHOULD NOT TAKE IT AS SETTLEMENT OF OUR CLAIM. I DID REJECT IT AND MADE IT CLEAR TO YOU THAT I SHOULD NOT BE RESPONSIBLE FOR ANY EXPENSES FOR THE HORSES. AS YOU ARE NOW MY ATTORNEY AND YOU HAVE BEEN WORKING ON MY CASE OVER THREE YEARS ON THE PRINCIPAL THAT YOU WILL TAKE ONE QUARTER OF WHAT YOU COLLECT OUT OF MY CLAIM. NOW YOU HAVE MADE IT THAT YOU AND I HAVE LOST EVERYTHING AS A RESULT OF THE BAD DECISION IN TAKING HORSES INSTEAD OF MONEY.

I BELIEVE THE HORSES SHOULD HAVE BEEN SOLD OUT AT THE SAME TIME THAT THE OTHER HORSES WERE SOLD WHEN THE MARKET WAS HIGH. EVEN THE RECORD SHOWS THIS WOULD HAVE BEEN HIGHER THAN WHAT THEY WERE APPRAISED.

AS YOU ARE MY ATTORNEY, YOU HAVE TO PROVE TO ME THAT THE BAD RESULTS EFFECTED [sic] YOU. YOU HAVE TO TAKE LEGAL ACTION AGAINST THE TRUSTEE WHO PLANNED AND FORCED US TO ACCEPT WE SHOULD TAKE HORSES INSTEAD OF CASH. IF THIS DECISION WAS YOURS, AS IT HAS BEEN YOUR IDEA TO BE IN THE HORSE BUSINESS, YOU HAVE TO COMPENSATE ME FOR MY LOSSES OR AT LEAST BEAR THE EXPENSES DUE TO YOUR DECISION TO TAKE THEM FOR BREEDING. THIS HAS COST OVER USD 130,000 AND JUDGE MCMAHON WAS NOT IN AGREEMENT AND IT WAS AT YOUR OWN RISK.

PLEASE KEEP IN MIND I HIRED YOU TO PROTECT MY RIGHTS AND, SHOULD THIS NOT BE THE CASE, I WILL BE FORCED TO TAKE LEGAL ACTION. I CAN NOT TAKE MORE SUFFERING THAN PERRET HAS ALREADY DONE TO ME.

BEST REGARDS

M.T. DABBAGH

EXHIBIT 13A

45. By words and deeds Schoeneman treated his 25% interest in any recovery under Dabbagh's claim as a joint venture with Dabbagh in the acceptance of horses in kind for the purpose of breeding and selling them at a profit. Towards this end he forwarded to Dabbagh a draft entitled "A Preliminary Outline" for the formation of a limited partnership "to be formed under the laws of the State of New York for the purpose of breeding thoroughbred horses for the commercial market....." Exhibit 10. In Schoeneman's covering letter to Dabbagh, dated November 12, 1983, he said:

While the general outline is essentially what I would like to see happen to maximize all *our return* from the brood-

mares, the details are entirely flexible and negotiable.

(Emphasis added).

46. Dabbagh acknowledged that his share of his $500,000 allowed claim was three-fourths, or $375,000 and that Schoeneman was entitled to one-fourth, or $125,000, as expressed in his Telex to Schoeneman dated August 12, 1984. Exhibit 24. Dabbagh said that he was willing to accept a $375,000 payment only up to September, 1984. In the event that Dabbagh was not paid $375,000 by September, 1984 and the horses were to be sold at the Fasig-Tipton sales in Kentucky in November, 1984, Dabbagh indicated his willingness to go along with the venture as proposed by Schoeneman, and said: "Thereafter will have to take chances on sales." Exhibit 24.

47. In reviewing the salient facts regarding the rights and obligations of the parties, consideration is given to the geographic contacts associated with these facts: Dabbagh is a resident of Saudi Arabia, Schoeneman is a resident of Washington, D.C. The debtors reside in Louisiana. The horses named in Article 5.06 of the Plan were boarded in Kentucky and Maryland. The debtor's horse farm was located in New York. The Chapter 11 trustee resides in New York. The estate is administered in New York. Schoeneman's power of attorney from Dabbagh expressly relates to Schoeneman's authority to act as agent for Dabbagh with regard to all matters concerning this case in New York. The TECO loan note was made in New York and Schoeneman and Dabbagh expressly agreed that the "note shall in all respects be governed by and construed in accordance with the laws of the State of New York...." The bank account in which Schoeneman deposited the TECO loan and from which he paid the expenses for boarding, breeding, and caring for the horses was maintained with a New York branch office of the European American Bank. The TECO security agreement with respect to the horses named in Article 5.06 of the Plan which Schoeneman signed for

himself and Dabbagh provides that it "shall be construed in accordance with and governed by the laws of the State of New York...." The stipulation which authorized Dabbagh to borrow funds from TECO to finance the upkeep of the horses assigned to him under Article 5.06 of the Plan was executed in New York by Schoeneman for Dabbagh and by the trustee's attorney on behalf of the Chapter 11 trustee. The stipulation was consented to by counsel for the creditors' committee in New York and thereafter approved by the Bankruptcy Judge in Poughkeepsie, New York. From the foregoing facts it is found that the state where most of the significant contacts occurred with respect to the Chapter 11 trustee's assignment of horses to Dabbagh pursuant to Article 5.06 of the Plan is New York.

## DISCUSSION

Article 5.06 of the confirmed liquidating Chapter 11 Plan in this case was structured so that Dabbagh should not get a leg up when the Chapter 11 trustee elected to assign to him specifically named horses before the other unsecured creditors received any distributions under the Plan. The shortfall liability imposed on Dabbagh under Article 5.06 was intended as an equalizer with respect to the funds or value realized by Dabbagh as a Class 6 unsecured creditor and the distributions received by the other unsecured creditors of this estate who were grouped separately in Class 7.

Two unexpressed assumptions apparently motivated the inclusion of the concept that Dabbagh should contribute to equalizing any shortfall in distributions to the Class 7 unsecured creditors. First, it was assumed that Dabbagh would realize value or funds after the trustee elected to assign to him horses in kind. Second, it was contemplated that there would be sufficient funds available after the payments required under the Plan to the secured claims and to the administrative expense and priority claims so that there would be a distribution to the unsecured creditors. Indeed,

the debtors believed when they consented to the Plan of liquidation proposed by the trustee and the creditors' committee that not only would the unsecured creditors be paid in full, but that the debtors would be able to salvage their home and sufficient additional assets to continue in the business of raising, breeding and selling thoroughbred horses. Unfortunately, market conditions in the thoroughbred horse business deteriorated and not only was the debtors' equity wiped out but there are presently insufficient assets in this estate to make any distributions to the unsecured creditors in Class 7. Moreover, Dabbagh, and the estate which retained a lien on the horses, realized no value from the auction sale conducted by the trustee's employer, Fasig-Tipton. In light of these operative facts, the court must now determine the extent of the defendants' liability, if any, with respect to the shortfall issue. Another issue for consideration is the estate's claim for the sale of stallion seasons which Dabbagh's attorney in fact and at law, Charles W. Schoeneman, negotiated with the Chapter 11 trustee after the trustee's assignment of horses to Dabbagh.

## CHOICE OF LAW

Inexplicably, the parties did not attempt to show which forum's law should govern this action. The Chapter 11 trustee is a resident of New York. Defendant Dabbagh is a subject and resident of the Kingdom of Saudi Arabia. Defendant Schoeneman is a resident of Washington, D.C. The facts in this case involve horses located in Kentucky and Maryland that were owned by the debtors who reside in Louisiana and who owned a horse farm in New York. Defendant Dabbagh had given Defendant Schoeneman a power of attorney to act as his attorney at law with respect to this bankruptcy case pending in the State of New York. The power of attorney related to property of this estate that was administered in New York by the Chapter 11 trustee.

 A bankruptcy court in a core matter is not bound, as is a court sitting in a diversity case, by the choice of law of the forum. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 162, 67 S.Ct. 237, 239, 91 L.Ed. 162, (1946) *reh. denied* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947). Thus, this court must apply the federal common law choice of law rule in order to determine the consequences resulting from Schoeneman's exercise of his power of attorney. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 121 (2d Cir.1984); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir.1980) *cert denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). In the *Ferer* case the court used a significant relationship test to determine which jurisdiction's law should apply. In addition to the fact that this estate and its property is administered in New York, the power of attorney which Dabbagh gave to Schoeneman expressly referred to the New York bankruptcy case as the focus for Schoeneman's actions with respect to the property of this estate. Thus, New York has the most significant relationship to the facts in this case, especially because Dabbagh authorized Schoeneman to act on his behalf with respect to all matters concerning this estate. This position is supported by Restatement, (Second) Conflict of Law § 292(2) (1971), which declares:

> (2) The principal will be held bound by the agent's action if he would so be bound under local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.

Accordingly, New York law will apply to Schoeneman's acts in the exercise of his power of attorney.

## DABBAGH'S LIABILITY

 Dabbagh is an unsecured creditor who originally held a $3,073,091 claim against this estate, which he agreed to reduce to $500,000 in the course of the negotiations which led to the confirmed

Chapter 11 liquidating plan of reorganization. In all his dealings with this estate, Dabbagh was represented by Schoeneman, who was authorized under a power of attorney to act as Dabbagh's attorney in fact as well as at law. The fact that Schoeneman disregarded Dabbagh's instructions and elected to take horses instead of cash does not relieve Dabbagh of the responsibility for Schoeneman's conduct while acting within the scope of his apparent authority. The general rule in this regard is as follows:

> If an act done by an agent is within the apparent scope of authority with which he has been clothed, it matters not that it is directly contrary to the instructions of the principal; the latter will, nevertheless, be liable unless the third person with whom the agent dealt knew that he was exceeding his authority or violating his instructions.

3 New York Jur., Agency § 329. Indeed, even in those instances, where the agent is guilty of fraud, and acts solely to benefit himself, the principal remains liable for the conduct of the agent if the agent acts with apparent authority. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corporation*, 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 *reh. denied*, 458 U.S. 1116, 102 S.Ct. 3502, 73 L.Ed.2d 1379 (1982). This point was expressed by the late Judge Augustus Hand as follows:

> In such circumstances the ignorance of the principal and the fact that the agent is engaged in a fraud either upon his principal or a third party will not avoid liability.

*Standard Surety & Casualty Co. of New York v. Plantsville Nat. Bank*, 158 F.2d 422, 424 (2d Cir.1946), *cert. denied*, 331 U.S. 812, 67 S.Ct. 1203, 91 L.Ed.2d 1831 (1947).

In the instant case, Schoeneman's election to keep the horses which the trustee elected to assign to Dabbagh pursuant to Article 5.06 of the Plan was within the scope of Schoeneman's apparent authority under his power of attorney from Dabbagh to act as Dabbagh's attorney in fact, as

well as at law. Schoeneman also possessed apparent authority to notify the Chapter 11 trustee on Dabbagh's behalf that Dabbagh elected to pay cash to satisfy Dabbagh's ratable shortfall liability as expressed in Article 5.06 of the Plan. Similarly, Schoeneman possessed apparent authority to enter into a credit transaction with the Chapter 11 trustee for the purchase of four stallion seasons for four mares assigned to Dabbagh. The stallion seasons were sold by the Chapter 11 trustee on a no guaranty basis, in that the agreed charges totalling $33,500, had to be paid by the purchaser whether or not the mares conceived foals. Accordingly, Dabbagh is liable for Schoeneman's actions because:

> [t]he general rule is that the acts of an agent, within the apparent scope of his authority, are binding on the principal. . . .

*Frank Mastoloni & Sons, Inc. v. U.S. Postal Service*, 546 F.Supp. 415, 421 (S.D. N.Y.1982). *Accord*, 3 Am.Jur.2d, Agency § 44 (1962).

### EXTENT OF DABBAGH'S LIABILITY

Schoeneman's acceptance, on Dabbagh's behalf, of nine mares named in Article 5.06 of the Plan and valued at $365,000, carried with it an agreement that Dabbagh and the other unsecured creditors would share ratably in any shortfall in the funds available under the Plan to satisfy their claims. Because he received mares in advance of distributions to other creditors, Dabbagh was required under Article 5.06 of the Plan to make one of two elections. First, upon notification by the Chapter 11 trustee that a shortfall was reasonably likely to exist, Dabbagh could return sufficient mares, based on the Bloodstock Appraisal value, to provide for the allocation of the shortfall. Thus, if he returned all of the mares, valued at $365,000, Dabbagh would have no further liability, regardless of the amount of the shortfall. Alternatively, Dabbagh had an election, which Schoeneman exercised on his behalf, to pay cash in the amount equivalent to the Bloodstock Appraisal of the nine mares, which was $365,000, "whereupon Dabbagh and the unse-

cured creditors shall receive the proceeds of sale pro rata and shall share in the shortfall ratably." The first option required Dabbagh to return sufficient mares to provide for the allocation of the shortfall. However, under the second option, Dabbagh was required to pay cash in the amount of the Bloodstock Appraisal value of all nine mares, namely, $365,000, without equating any portion of the cash to the amount needed to allocate the anticipated shortfall. Thus, under the second alternative, which Schoeneman elected on Dabbagh's behalf, Dabbagh was required to pay to the Chapter 11 trustee, upon notification of a reasonably likely shortfall, $365,000. Thereafter, Dabbagh and the unsecured creditors would share in the proceeds of the sale of the nine mares on a *pro rata* basis. Because there were no proceeds of sale realized after the payment of TECO's lien and the auction expenses with respect to the nine mares, Dabbagh and the unsecured creditors have nothing of value to share, *pro rata* or otherwise.

■ In the exercise of hindsight it is patently clear that Schoeneman's acceptance, on Dabbagh's behalf, of nine mares, when coupled with the election to pay cash equivalent to the Bloodstock Appraisal value of the nine mares, namely $365,000, and then share in any proceeds realized from their sale, was an extremely bad business decision. However, even in the exercise of foresight, Schoeneman was on notice, as expressed in Article 6.02 of the Plan, that the estate was anxious to unload these mares because delivery of the mares would relieve the estate of boarding and feeding them. Additionally, it is stated that such delivery "will relieve the estate of the obligation to enter into stallion service contracts for these horses for the 1984 foaling season." Accordingly, Dabbagh must be held liable for Schoeneman's acceptance of these expenses with full notice that they would reduce the amount of any proceeds that might be realized from the sale of the nine mares. Unfortunately for this estate, the Chapter 11 trustee consented to giving TECO a first security interest in the mares in order to induce TECO to grant Dabbagh

a $200,000 loan for their upkeep. In effect, the Chapter 11 trustee subordinated the estate's lien on the mares in favor of TECO's first security interest which served as collateral for the TECO loan to Dabbagh to finance the upkeep expenses. Therefore, the Chapter 11 trustee cancelled out any relief to the estate it might have obtained as a result of his assignment of the mares to Dabbagh.

■ In view of the fact that there were no proceeds realized from the sale of the nine mares after the payment of TECO's lien and the auction expenses, it follows that Dabbagh's obligation to pay the $365,000 Bloodstock Appraisal value of the nine mares assigned to him pursuant to Article 5.06 of the Plan is now unconditionally due. He is also liable for $33,500 with respect to the four stallion seasons which were purchased on his behalf to service four of his assigned mares, together with interest on the stallion seasons debt at the rate of 1½% per month from the due date of October 1, 1984.

## SCHOENEMAN'S LIABILITY

■ If Schoeneman's transactions with the Chapter 11 trustee were merely those of attorney in fact for Dabbagh he could not be held personally liable for his conduct, absent the existence of "clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Mencher v. Weiss*, 306 N.Y. 1, 4, 114 N.E.2d 177 (1953); *See, Salzman Sign Co., Inc. v. Beck*, 10 N.Y.2d 63, 67, 217 N.Y.S.2d 55, 176 N.E.2d 74 (1961); *Hall v. Lauderdale*, 46 N.Y. 70, 74 (1871). This principal is based upon the general rule in New York that "[o]ne who deals with an agent does so at his peril, and must discover the actual scope of his authority." *Ford v. Unity Hospital*, 32 N.Y.2d 464, 472, 346 N.Y.S.2d 238, 241, 299 N.E.2d 659, 664 (1973); *Accord, Greene v. Hellman*, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980); *General Overseas Films, Ltd. v. Robin International, Inc.*, 542 F.Supp.

684, 688 (S.D.N.Y.1982), *aff'd* 718 F.2d 1085 (2d Cir.1983). Schoeneman submitted his personal financial statement to induce TECO to advance a loan to cover the expenses of maintaining the horses. He also signed the TECO note twice in the dual capacity as attorney for Dabbagh and in Schoeneman's individual capacity. These facts might suffice to support an intention "to substitute or superadd" Schoeneman's personal liability to TECO. *See, Mencher v. Weiss,* 306 N.Y. at 5, 114 N.E.2d 177. However, Schoeneman's liability to TECO or to Dabbagh is not at issue in this case.

■ Schoeneman dealt with this estate as an individual who held a 25% interest in any recovery that Dabbagh might realize in this case. In order to maximize this return, Schoeneman determined that it was in their joint interests to accept the delivery of horses in kind in lieu of a possible cash distribution following the administration of this estate and to breed and sell the horses in the hope that the proceeds from their sale would exceed any distribution Dabbagh might receive from this estate. Hence, Schoeneman and Dabbagh proceeded to go into the horse business even though Dabbagh preferred to receive $375,000 in cash immediately, rather than accept horses for sale. However, an immediate cash distribution was not authorized under the Plan. If Dabbagh wanted cash he would have had to wait until the case was fully administered at which time payment would be made only if sufficient funds were available with respect to his unsecured claim. Accordingly, he reluctantly advised Schoeneman that if he could not receive $375,000 immediately he would "have to take a chance on sales." Exhibit 24.

A joint venture under New York law is defined as "an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; a combination of property, efforts, skill and judgment in a common undertaking." *U.S. Standard Oil Company of California,* 155 F.Supp. 121, 148 (S.D.N.Y.1957), *aff'd* 270 F.2d 50 (2d Cir.1959). *Accord, McGhan v.*

*Ebersol,* 608 F.Supp. 277, 282 (S.D.N.Y. 1985); *Sherrier v. Richard,* 564 F.Supp. 448, 457 (S.D.N.Y.1983); *Ackerman v. Landes,* 112 A.D.2d 1081, 493 N.Y.S.2d 59 (2d Dep't 1985); *Chalmers v. Eaton Corp.,* 71 A.D.2d 721, 419 N.Y.S.2d 217 (3d Dep't 1979). The essential elements for a joint venture are:

> [T]he intent of the parties, express or implied, whether there was joint control and management of the business, whether there was sharing of profits and losses, and whether there was a combination of property, skill or knowledge. *Ramirez v. Goldberg,* 82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dep't 1981). Finally, a joint venture may be created by an oral agreement.

*Sherrier v. Richard,* 564 F.Supp. at 457.

The basic ingredient in a joint venture is the parties' agreement to share in the profits of the undertaking, *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 690 (2d Cir.1983). Although not essential, there is usually a concomitant agreement to submit to the burden of making good the losses. *Id.* However, it is not indispensably essential that there be an agreement to share losses. *Allen Chase and Company v. White, Weld & Co.,* 311 F.Supp. 1253, 1259 (S.D.N.Y. 1970); *Chipman v. Steinberg,* 106 A.D.2d 343, 344, 483 N.Y.S.2d 256, 258 (1st Dep't 1984), *aff'd* 65 N.Y.2d 842, 493 N.Y.S.2d 129, 482 N.E.2d 925 (1985); *Mariani v. Summers,* 3 Misc.2d 534, 52 N.Y.S.2d 750 (Sup.Ct.N.Y.Co.1944), *aff'd,* 269 App.Div. 840, 56 N.Y.S.2d 537 (1st Dep't 1945). Similarly, in the sharing of joint control and management, one joint venturer may be active and the other passive, because;

> The requirement of joint control and management cannot mean that each coventurer must involve himself in every detail of the joint venture. Surely the parties to a joint venture may choose to divide the responsibilities between themselves....

*Halloran v. Ohlmeyer Communications Co.,* 618 Supp. 1214, 1219 (S.D.N.Y.1985). Moreover, one joint venturer may risk money or property and the other may risk the

loss of the value of the services performed in furtherance of the joint venture. *In re York Furniture Co., Inc.*, 32 B.R. 211, 215 (Bankr.S.D.N.Y.1983).

In the instant case, Schoeneman contributed his personal services and skill. Dabbagh contributed the nine mares that were assigned to him by the Chapter 11 trustee. In view of the fact that a cash distribution to the unsecured creditors in this case was not assured, Schoeneman decided to assume the risk of merchandising the horses. He proceeded to engage in business as Worldwide Thoroughbreds, which was an entity consisting of himself and Dabbagh. He submitted his own personal financial information in support of the TECO loan and signed the TECO note in the dual capacity as attorney in fact for Dabbagh and as an individual obligor. He went beyond his status as agent for Dabbagh and assumed the role of a joint venturer with Dabbagh and employed his services and skill for the sake of sharing with Dabbagh in the proceeds realized from the breeding and selling of horses. They both hoped to profit from a sale of the horses rather than gamble on awaiting a cash distribution at the conclusion of this case. In so doing, Schoeneman acted not only as an attorney in fact for Dabbagh, but also as a principal with him. The concept of a mutual agreement between the joint venturers was complete when Dabbagh agreed to "take chances on sales." Exhibit 24.

As a principal as well as an agent for Dabbagh, Schoeneman is jointly and severally liable with Dabbagh for the obligations arising out of their joint venture. Therefore, Schoeneman is obligated to the Chapter 11 trustee to pay the $365,000 Bloodstock Appraisal value of the nine mares assigned to Dabbagh in accordance with Article 5.06 of the Plan. Schoeneman is also liable for the four stallion seasons he purchased from the Chapter 11 trustee in the sum of $33,500, together with interest at the rate of 1½% per month from the due date on October 1, 1984.

## SCHOENEMAN'S COUNTERCLAIM

■ In his counterclaim, Schoeneman charges that the Chapter 11 trustee interfered with Schoeneman's attempt to exercise complete control over the disposition of the horses assigned to Dabbagh and refused to transfer registration documents to Schoeneman unless the horses were auctioned off under the *aegis* of Fasig-Tipton, the Chapter 11 trustee's employer. Schoeneman charges the Chapter 11 trustee with a conflict of interest and seeks his removal as well as damages for himself and Dabbagh.

Schoeneman lacks any standing to seek relief for Dabbagh. Schoeneman notified Dabbagh by Telex received on February 21, 1985 that he resigned as Dabbagh's attorney and as chairman of the creditors' committee. Schoeneman's resignation as counsel for Dabbagh was approved by this court on August 19, 1986.

■ Schoeneman's counterclaim on behalf of the estate is similarly flawed. He no longer represents Dabbagh's interests as a member of the creditors' committee, nor is he a creditor of this estate. Therefore, Schoeneman lacks standing in his own right to seek the removal of the Chapter 11 trustee or to seek damages on behalf of the creditors of this estate.

■ Schoeneman's counterclaim for relief for himself individually was not sustained. The Chapter 11 trustee's withholding of jockey club certificates and other registration papers with respect to the horses assigned to Dabbagh was consistent with the estate's lien on the horses as provided under the Plan and pursuant to the court-approved stipulation dated July 17, 1984. Schoeneman also failed to establish that the Chapter 11 trustee denied Schoeneman the right to enter the most valuable horses in any auction other than a Fasig-Tipton auction. Indeed, the evidence reveals that Schoeneman agreed with the Chapter 11 trustee that the Fasig-Tipton auction in Kentucky on November 9, 1984 was the best time and place to sell the

assigned horses so as to maximize the proceeds from their sale.

## CONCLUSIONS OF LAW

1. Pursuant to an Administrative Order, dated June 16, 1986, the Judicial Council of the Second Circuit approved the temporary assignment of this Bankruptcy Judge in the Southern District of New York "to the Bankruptcy Court of the Northern District of New York to preside over the matter of Marion Perret and Annette Perret, d/b/a Hill Haven Farm, 82–10055."

2. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (C).

3. The Chapter 11 trustee has sustained his burden of proving that the defendants, Mohammed Taieb Dabbagh and Charles W. Schoeneman, are jointly and severally liable to pay this estate the sum of $365,000 which is due and owing pursuant to Article 5.06 of the confirmed Plan of Reorganization.

4. The Chapter 11 trustee has sustained his burden of proving that the defendants, Mohammed Taieb Dabbagh and Charles W. Schoeneman, are jointly and severally liable to pay this estate the sum of $33,500 which is due and owing to this estate for the 1984 stallion seasons purchased by Schoeneman on behalf of Dabbagh and himself, together with interest thereon at the rate of 1½% per month from November 1, 1984.

5. The counterclaim filed by Charles W. Schoeneman as former attorney for Mohammed Taieb Dabbagh and as former chairman of the creditors' committee, which seeks relief on behalf of Dabbagh and this estate, is dismissed for lack of standing, because Schoeneman is no longer attorney for Dabbagh or chairman of the creditors' committee.

6. The counterclaim filed by Charles W. Schoeneman is dismissed to the extent that it seeks damages on his own behalf, because Schoeneman has failed to sustain his burden of proof that he was entitled to unfettered control over the horses which the Chapter 11 trustee assigned to Dabbagh. Schoeneman has also failed to prove that he was entitled to receive from the Chapter 11 trustee the jockey certificates or other documents of title to the horses prior to his satisfaction of the estate's lien on such horses. Additionally, Schoeneman has failed to sustain his burden of proving that the Chapter 11 trustee prevented him from selling the horses in any manner than at an auction conducted by the trustee's employer, Fasig-Tipton, or that Schoeneman sustained any damages by reason of the Chapter 11 trustee's conduct, as alleged in the counterclaim.

SETTLE ORDER ON NOTICE in accordance with the foregoing.